**PANHANDLE EASTERN PIPE LINE CO., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 16479.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 17, 1962.

Decided March 15, 1963.

Wilbur K. Miller, Danaher, Bastian and Burger, Circuit Judges, dissented.

Mr. Harry S. Littman, Washington, D. C., with whom Messrs. Dale A. *Wright*, and Richard Littell, Washington, D. C., were on the brief, for petitioner.

Miss Josephine H. Klein, Atty., F. P. C., with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., Abraham R. Spalter, Asst. Gen. Counsel, F. P. C., and Ralph S. Spritzer, Gen. Counsel, F. P. C., at the time the brief was filed, were on the brief, for respondent. Mr. John C. Mason, Gen. Counsel, F. P. C., at the time the record was filed, also entered an appearance for respondent.

Mr. Jerome Maslowski, Lansing, Mich., filed a brief on behalf of Michigan Public Service Commission, as amicus curiae, urging reversal.

Mr. Lawrence H. Gall, Washington, D. C., filed a brief on behalf of Independent Natural Gas Association, as amicus curiae, urging reversal.

Mr. William E. Torkelson, Madison, Wis., filed a brief on behalf of Public Service Commission of Wisconsin, as amicus curiae.

Mr. William M. Bennett, San Francisco, Cal., filed a brief on behalf of Public Utilities Commission of the State of California, as amicus curiae.

Before BAZELON, Chief Judge, and EDGERTON, WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER and J. SKELLY WRIGHT, Circuit Judges, sitting en banc.

BAZELON, Chief Judge.

In a rate proceeding under § 4(e) of the Natural Gas Act,[1] the Federal Power Commission allowed Panhandle Eastern Pipe Line Company an over-all return of 6.25 per cent on its total rate base, reflecting a rate of return of 1.5 percent on $11,000,000 of investment from its reserves for deferred income taxes. In this petition for review, Panhandle's only complaint relates to the rate allowed on the reserves.

1. 15 U.S.C. § 717c(e).

These reserves are generated by Panhandle's use of § 167 of the Internal Revenue Code[2] which authorizes taxpayers to write off depreciable property more quickly than is permitted under the "straight-line" method of depreciation. The liberalized method provides higher depreciation deductions and therefore lower taxes during the early part of the life of a given property, and lower deductions and higher taxes in the later years of the life of the property. The total depreciation deductions available to a company over the entire life of a facility are the same using either method. The comparative advantage provided by liberalized depreciation is that it defers to the later life of a given property a portion of the taxes on income that would be payable in the early years under straight-line depreciation, and gives the company the use of such moneys in the interval. Liberalized depreciation under § 167 is thus said to result in tax deferrals rather than tax savings. Cf. City of Detroit, Mich. v. Federal Power Comm., 97 U.S.App.D.C. 260, 230 F.2d 810 (1955); El Paso Natural Gas Co. v. Federal Power Comm., 281 F.2d 567, 573 (5th Cir.1960). But see Eisner, Depreciation under the New Tax Law, 33 Harv.Bus.Rev.No. 1, pp. 66–74.

In City of Detroit, we sustained the Commission's action in permitting Panhandle (1) to use the straight-line method of depreciation in fixing its rates, while using the accelerated method for computing its tax expense, and (2) to include reserves for deferred taxes in its rate base. We rejected a rate-payer's objection that such treatment did not produce the "lowest reasonable rates" required by § 5(a) of the Natural Gas Act.[3] But the question of what return, if any, should be allowed on reserve funds included in the rate base was not before us in City of Detroit. It is the sole question presented in this case.

Here the Commission, following its decision in Northern Natural Gas Co., 25 F.P.C. 431 (1961), "divided the benefits of liberalized depreciation between the regulated company and the rate-payer" giving the "major portion of the benefits to the rate-payer." It permitted Panhandle "only so much of [a return on funds generated by the use of liberalized depreciation] as is necessary to provide it with a sufficient incentive to continue to use liberalized depreciation." Thus, a substantially lower rate of return was attributed to those funds than to other capital.

Panhandle insists that Congress intended all the benefits of liberalized depreciation for the taxpayer and none for the rate-payer. Accordingly, it urges that the tax statute assures a "full return" on the deferred tax reserves equivalent to the rate of return of 6.46 percent which the Commission allowed on other investment.

In their briefs, the Commission and some of the State Commissions suggest that the regulatory treatment of tax benefits is entirely a matter of discretion and policy within the administrative competence of the agencies charged with regulating rates, and that consequently the Commission would have power to deny the company *any* return on the funds generated by liberalized depreciation and to *require* the companies to continue to utilize such depreciation. But the Commission did not follow that course. Instead, it sought to give "such effect to the purposes of the tax statute as is appropriate within the principles of regulatory law expressed in the Natural Gas Act." We therefore intimate no opinion concerning the validity of the course proposed in the briefs, and consider only the Commission's action under review.

In reviewing that action, we must first decide whether the congressional purposes underlying the tax and gas acts are effectuated by permitting a rate of return on the funds generated by the use of liberalized depreciation no higher than that required to provide the company with "a sufficient incentive to continue

---

2. 26 U.S.C. § 167.

3. 15 U.S.C. § 717d(a).

to use liberalized depreciation." And if they are, we must then decide whether 1.5 per cent constitutes such a rate of return.

■ We now briefly consider the policy underlying § 167 of the tax statute. Nothing in the language or legislative history indicates that Congress considered its regulatory consequences. Thus, to infer that the statute materially altered fundamental principles of rate regulation—which require rates to reflect actual costs of capital—it must clearly appear that Congress intended to benefit producers to the exclusion of consumers. It does not so appear: the legislative history reveals that Congress intended the statute "to have far-reaching economic effects" extending to "all segments of the American economy." [4] Liberalized depreciation was seen as a means toward a broad economic goal; it was expected to "assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." (House and Senate Reports accompanying Internal Revenue Code of 1954, reprinted in U.S.Code Cong. & Ad. News, 83d Cong., 2d Sess. Vol. 3, 4046–48, 4655, 4835.)

To set this economic spiral in motion, producers must, of course, be willing to invest in plant and incur the attendant risks. Congress permitted "acceleration in the speed of the tax-free recovery of costs [because it considered this] of critical importance in the decision of management to incur [such] risks." Ibid. The Commission's decision does not disturb this acceleration; it relates only to the rate of return allowed a regulated company on the reinvestment of the money thus recovered. Although Congress was not directly concerned with this rate, it may be argued that to the extent that this rate influences the company's initial decision to invest in plant, it does touch upon the congressional purpose underlying the tax act. But even under this view, the congressional purpose could not be adversely affected unless the regulated companies were prevented from re-employing recovered funds at a sufficient profit to provide incentive to initial investment.

The Commission explicitly rested its determination on the judgment that the rate of return it allowed on the recovered funds, taken with the other "material advantages," [5] would provide the company "with a sufficient incentive to con-

4. Insofar as the opinion in City of Detroit, supra, indicates that the intent of Congress in the revenue act was to benefit taxpaying producers and not their consumers, we may regard it as limited to the circumstances of that case, where the petitioning consumer sought to have the amounts recovered as depreciation expense deducted entirely from the producer's rate base. We held that the Commission properly included such reserves in the rate base. The present case is distinguishable. Here the Commission seeks only to limit the rate of return on such reserves. And since the opinion in City of Detroit uses language broader than required for the decision on this aspect of the case, we are not constrained to read the case as deciding that in all circumstances and in the light of greater experience with the operation of § 167 the greatest possible benefit should inure to the producer and none at all permitted to the consumer. Furthermore, the additional advantages to the taxpaying producer in using accelerated depreciation urged in this case appear to be more substantial than those discussed in City of Detroit. See note 5, infra.

5. The other "material advantages" which the Commission found would result from "the use of deferred taxes to supply a portion of the company's capital requirements," are as follows:

"The substantial sums involved are readily available without resort to the market, and such additions to capital serve to reduce the company's debt ratio. The acquisition of plant by use of deferred taxes provides additional security not subject to lien on which new loans can be based, perhaps at lower interest rates than would otherwise be possible. Furthermore, deferred tax funds accumulated between rate cases and invested in plant may, during that period, increase the company's earnings. Finally, the accumulation of deferred taxes increases the company's funds available for expansion without issuing additional common stock."

tinue to use liberalized depreciation * * *." This implicitly recognizes that, since the recovered funds were acquired at no cost to the company, and since the risks involved in their reinvestment are minimal as compared with the risks generally encountered by non-regulated producers, a return of 1.5 per cent provides sufficient profit incentive for the company to continue generating these funds by investing in plant and utilizing accelerated depreciation.

■ Since there is no indication that Congress intended to bestow upon the producers *qua* producers any benefits beyond those necessary to provide incentives to investment, we conclude that, if a return of 1.5 per cent taken with the other advantages does provide such incentive, the Commission's decision would be consistent with the congressional policy underlying the tax statute.

■ Next we consider "the principles of regulatory law expressed in the Natural Gas Act," which impelled the Commission to allow no more of a return on these funds than that necessary to effectuate the tax act. These principles include the requirement that a public utility must operate on the most economical basis consistent with good service and sound finance. Implicit in this requirement is the rule that the rates charged must reflect the company's actual total costs, including its cost of capital. Since the capital represented by the funds generated by accelerated depreciation cost the company nothing, sound principles of rate regulation support the Commission's decisions to permit the

company no more of a return on these funds than that necessary to effectuate the congressional policy underlying the tax statute. See Cities of Lexington, et al. v. Federal Power Comm., 295 F.2d 109 (4th Cir.1961); El Paso Natural Gas Co. v. Federal Power Comm., 281 F.2d 567 (5th Cir.1960).

■ The Commission, "[a]fter careful consideration of the various factors involved" decided that a specific return of 1.5 per cent on the recovered funds, coupled with the other advantages derived from the use of liberalized depreciation, provides sufficient incentive for the continued use of liberalized depreciation. This conclusion was "largely a matter of judgment based upon such factors as [the Commission's] knowledge of the money market, and [its] estimate as to what course most regulated companies will elect to pursue in the future." Since these evaluations are within the expert competence of the Commission, we do not disturb the conclusions derived from them.

Affirmed.

WILBUR K. MILLER, Circuit Judge, with whom DANAHER, BASTIAN and BURGER, Circuit Judges, join (dissenting).

The erroneous order now affirmed by the majority derived largely from two sources: (a) the mistaken notion that, as to industries regulated by it, the Commission has power to limit the effect of the plain mandate of Congress expressed in Sections 167 and 168,[1] and (b) the

---

1. 26 U.S.C. §§ 167 and 168. Section 168, providing for accelerated amortization, was originally enacted in 1950 as Section 124A. Section 167, the liberalized depreciation measure, was adopted in 1954.

Under these sections a company may elect to employ, in computing its income taxes, accelerated amortization or liberalized depreciation of certain facilities instead of normal straight-line depreciation. Obviously, this treatment of depreciation results in greater annual deductions therefor during the early years of the property's anticipated useful life than does the straight-line method, and

so reduces the tax payments during those years. It is equally obvious that, after enhanced depreciation is taken during the early years, depreciation deductions during the later years will be correspondingly smaller, so that income tax payments will then be higher than if normal straight-line depreciation had been used for income tax purposes throughout the useful life.

It is thus seen that accelerated amortization and liberalized depreciation produce only temporary tax savings: a portion of the tax payments which would be due in the early years under straight-line depreciation is merely deferred until

Commission's refusal, contrary to its own precedents and in defiance of our City of Detroit opinion,[2] to recognize that the statutory accelerated amortization and liberalized depreciation are essentially bookkeeping entries for federal income tax purposes, in which the ratepayers have no interest. They stand apart from these transactions between the Government and the taxpaying pipeline company, and continue to pay rates based on straight-line depreciation throughout the useful life of depreciable facilities, no more and no less. Thus, to give the ratepayers the lion's share of accelerated amortization and liberalized depreciation during the earlier years of useful life without requiring them to bear a corresponding share in the disadvantages of the later years when there is no amortization and smaller depreciation, is to confer on them an unfair advantage which is directly contrary to what Congress commanded. It also unfairly takes from the pipeline company a portion of the total depreciation it is entitled to recover.

A statement of the case's background will place these points in proper perspective, and will serve to introduce my subsequent discussion of the majority opinion's infirmities. Such a statement follows.

In August, 1952, soon after the enactment of the accelerated amortization statute—Section 124A (now Section 168)—Panhandle initiated a proceeding before the Commission for a declaratory order as to whether it would be allowed to retain the tax benefits which would result if it were to adopt accelerated amortization under that section. On December 4, 1953, after expanding the proceeding into a rule-making determination in which Panhandle participated, the Commission issued its Opinion No. 264, Treatment of Federal Income Taxes as Affected by Accelerated Amortization, 12 F.P.C. 369. It there announced the general rule that pipeline companies would be allowed to retain all the benefits resulting from accelerated amortization and that none of these benefits would be passed on to utility customers.

In the course of its opinion, the Commission said, at pages 370, 371 of 12 F.P.C.:

"* * * The former section 124 of the Code having been made applicable to certified emergency facilities constructed by utility companies, as well as others, and the new section 124A [now 168] having the same jurisdictional language and the same basic objectives, the new section, of course, is applicable to electric public utilities and natural gas companies and we have no alternative but to construe it so. In fact, no one who argued before us disputed this point.

"Under the accelerated amortization provision of section 124A, any taxpayer who has received a certificate of necessity issued by the proper defense agency for the construction of an emergency facility may elect to take a deduction from gross income over a period of 60 months for the amortization of a specified percentage of the cost of such emergency facilities in lieu of equal annual deductions for exhaustion, wear and tear, and obsolescence during the estimated life of the facilities. Congress sought by this

the later years. In the meantime, however, if the taxpayer is actually accumulating a reserve for income taxes based on straight-line depreciation, it has during the early years an excess of reserve over actual current payments which it can use for plant expansion or other investment purposes until it is needed to make the larger tax payments of the later years. This is the principal benefit Congress intended to confer on the taxpaying company by enacting Sections 167 and 168. It is plain, I think, that the payer of rates calculated on straight-line depreciation during the whole useful life is not affected by, and therefore has no interest in, these statutory provisions.

2. City of Detroit v. Federal Power Comm., 97 U.S.App.D.C. 260, 230 F.2d 810 (1955), cert. denied Panhandle Eastern Pipe Line Co. v. City of Detroit, Mich., 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956).

accelerated amortization provision to encourage the construction with private capital of those facilities which were deemed of sufficient value to the national defense to warrant the issuance of a certificate of necessity.

"Thus, the recipient of a certificate of necessity obtains substantial deductions against the net income for income tax purposes during each of the first 5 years, and much smaller deductions therefrom during the remainder of the normal amortization period. If the income tax rates remained the same during the entire life of the facilities, the same amount of taxes ultimately would be paid under either accelerated or normal amortization. By the enactment of this law, Congress did not forgive the payment of any income taxes; it merely allowed payment of some of them to be deferred. This has the precise effect of a grant by our Government to a certificate holder of an interest-free loan.

"Although all parties concede that certificates of necessity issued to electric public utilities and natural gas companies are perfectly valid and lawful, it has been strenuously argued that this Commission should nullify them by reducing the rates of such companies during the 5-year period of rapid amortization and thereby pass on to the customers of such companies the money which otherwise would inure to these companies by reason of their being permitted to defer payment of a portion of their income taxes.

"The answer to this contention is that Congress obviously did not intend to make cash donations to the particular persons who happen to be, during the 5-year period of accelerated amortization, the customers of the particular utilities which have received the certificates of necessity. Such a result would be inconsistent with the effort of Congress to aid our national defense."

The Commission added, at page 373 of 12 F.P.C.:

"Not infrequently the depreciation methods allowed and recognized by a regulatory agency are not the same as those used by the utility for computing income taxes. We will recognize normal depreciation where a public utility or natural gas company has the privilege of accelerated amortization under section 124A [now 168] of the Internal Revenue Code. We will use all safeguards at our command to insure that the rate-payer [sic] is protected from bearing any burden greater than normal depreciation after the period of accelerated amortization has expired. * * *

" * * * [I]t is clear to us that Congress, by the enactment of this law, did not intend to make gifts to the customers of the public utilities and natural gas companies which received certificates * * *."

Against that background, Panhandle elected to use accelerated amortization for federal income tax purposes and constructed new facilities with funds thereby accumulated.

On April 15, 1954, the Commission entered an order prescribing certain rates and charges for Panhandle. With respect to the latter's use of accelerated amortization, the Commission said.[3]

" * * * We have computed the tax payments which would have been required without the accelerated amortization which Panhandle is permitted, and for the purposes of the rate schedules under study have considered that Panhandle will be allowed as operating expenses such normalized taxes. This does not allow Panhandle for rate purposes more than a fair return over the long period, but does recognize the grant by Congress of certain temporary

---

3. Opinion No. 269, Panhandle Eastern Pipe Line Co., et al., 13 F.P.C. 53, 83 (1954).

tax savings under Section 124A [168]."

Since Section 124A (168) was not intended to reduce but only to defer tax liability, the Commission further stated:[4]

" * * * [T]he accruals for taxes in excess of those actually paid should logically be treated by Panhandle, not as free and unrestricted income, but earmarked to provide for the future meeting of such liability."

The City of Detroit and County of Wayne, customers of Panhandle, petitioned this court for review of the order of April 15, 1954, on the ground, *inter alia,* that the Commission erred in "normalizing" income tax expense as if amortization had not been accelerated. They contended that the saving effected by the accelerated amortization should inure, partly at least, to the benefit of consumers.

We held the Commission had correctly concluded "that the intent of Congress reflected in section 124A [168] is not to benefit consumers but rather the taxpayer in order to encourage construction of certain emergency types of facilities." [5] We added the following:[6]

" * * * Were the tax savings deducted from the rate base, the taxpayer here would not receive the intended benefit. The valuations upon which it is entitled to earn a fair rate of return would be decreased by the amount of the savings. In placing the savings at the disposal of Panhandle under the limitations specified, the Congressional intent is effectuated. The funds go into a reserve account for the payment of the deferred taxes to accrue after the five year amortization period. Though thus earmarked, the funds are available for income-producing purposes. Unless this is permitted, it is difficult to see how Panhandle could benefit substantially from section 124A [168]. This statute, unlike the Natural Gas Act itself, is not for consumer benefit. It has a different public policy and should be given effect as intended by Congress. Furthermore, the solution of the Commission does not result in higher rates to the consumer. It simply does not operate to reduce them. It aids Panhandle but neither aids nor harms petitioners. We think this is the result sought by Congress."

As the opinion of this court thus recognized, the purpose of Congress in enacting the accelerated amortization statute was to encourage industry, including natural gas companies, to invest more capital in fixed assets and thereby to increase productivity and spur the national economy. If the economic advantage arising out of the accelerated amortization is to be largely passed on to the ratepayers—which is the effect of the Commission's order—the purpose of Congress will be defeated as far as public utilities are concerned.

It will be observed that the City of Detroit case dealt only with accelerated amortization under what is now Section 168. With respect to Section 167, the Commission ruled in Amere Gas Utilities Co., et al., 15 F.P.C. 760, at 781 (1956), that liberalized depreciation should be accorded the same treatment as that given to accelerated amortization. It said, at pages 781–782:

"We are in agreement with the decision of the presiding examiner. We can find no legal difference between the problem now before us and that which was presented to us by section 124A (now section 168) of the Internal Revenue Code, pertaining to 5-year amortization of defense facilities pursuant to a certificate issued by a defense agency of the United States. Therefore, what was said in our opinion No. 264 in docket No. R–126, and in our opinion

---

4. Ibid.

5. City of Detroit v. Federal Power Comm., 97 U.S.App.D.C. at 272, 230 F.2d at 822.

6. Ibid.

No. 269 in Panhandle Eastern Pipe Line Co., docket No. G–1116, et al., and what was said by the United States Court of Appeals for the District of Columbia Circuit in City of Detroit v. Federal Power Commission, on December 15, 1955 ([97 U.S.App.D.C. 260], 230 F.2d 810), in which the Commission's treatment of accelerated depreciation [sic] in the Panhandle case was fully approved, *is completely controlling in this matter.*

"Admittedly, section 167 of the Internal Revenue Code contains no specific mandate to create a reserve account for the deferred taxes. Nevertheless, we know of no way to effectuate the clear and obvious Congressional intent, except by doing so, just as we did in our two prior opinions above mentioned. The argument that the sums in the reserve account will rightfully belong to the rate payers, or that the rate payers will bear any burden they do not now bear, by reason of the creation of the reserve, is wholly erroneous, as was lucidly explained by the United States Court of Appeals for the District of Columbia, above cited:

"'* * * The funds go into a reserve account for the payment of the deferred taxes to accrue after the 5-year amortization period. Though thus earmarked, the funds are available for income-producing purposes. Unless this is permitted, it is difficult to see how Panhandle could benefit substantially from section 124A [now 168]. This statute, unlike the Natural Gas Act itself, is not for consumer benefit. It has a different public policy and should be given effect as intended by Congress. Furthermore, the solution of the Commission does not result in higher rates to the consumer. It simply does not operate to reduce them. It aids Panhandle but neither aids nor harms petitioners. We think this is the result sought by Congress. * * *'

"It is clear that the charging of greater depreciation during the early life of property and the charging of less during the later life operates to create a deferral of income taxes. The fact that there may be continuing additions to plant, year by year, with the result that there will be a balance in the reserve account at all times in the foreseeable future, does not prove that there is no tax deferral. On the contrary, it proves that there is a continuing tax deferral so long as additional facilities are being installed. This is precisely what Congress intended.

\* \* \* \* \* \*

"*We cannot strike down an act of Congress if we think it unwise, or unnecessary to a particular industry, and enforce it only if it is in accord with our economic and regulatory philosophy.* It is undisputed that section 167 of the Internal Revenue Code does apply, and was intended to apply to regulated natural gas companies, such as the petitioners." (Emphasis added.)

Thereafter, Panhandle elected to use liberalized depreciation for federal income tax purposes and decided to build numerous facilities with funds so derived. Through the two methods of tax deferral, Panhandle accumulated $11,076,954,[7] which the Commission, true to its promise in its Opinion No. 264[8] required it to record in a special account entitled "Accumulated Deferred Taxes on Income" so it would be available to pay the larger taxes during the later years when little or no depreciation deduction for tax purposes could be taken. Thus, the ratepayers were assured that, throughout the useful life of the facili-

---

7. $4,116,859 under Section 167; $6,960,095 under Section 168. Section 167 is a continuing provision, whereas certification under Section 168 has terminated.

8. Treatment of Federal Income Taxes as Affected by Accelerated Amortization, supra.

ties, they would contribute no more than the income taxes based on normal straight-line depreciation.

On September 28, 1960, while the present proceeding was pending before it, the Commission again decided, in Phillips Petroleum Co., 24 F.P.C. 537, that the benefits resulting from the use of accelerated amortization were intended for and should be retained by the taxpayer and not passed on to its customers. There it rejected its staff's proposal to artificially treat the accrued taxes as though they were a part of the company's capitalization and allow a return thereon at less than the full over-all rate. The Commission said, at page 570:

"There was no dispute about these figures, but the staff contended that Phillips' actual debt ratio and actual cost of debt should be adjusted to reflect as an interest-free loan an item of deferred Federal income tax liability in the amount of $19,162,-355, arising from the accelerated amortization provisions of Section 168 of the Internal Revenue Code. This would decrease Phillips' cost of debt to 2.76 percent. The examiner refused to make this adjustment, and we agree. *The accelerated amortization provisions were to benefit the taxpayer, not the consumers.* They represent an advantage bestowed by Congress to encourage the construction of emergency facilities, and *we are not authorized to take away this advantage.* City of Detroit v. F. P. C., [97 U.S.App.D.C. 260, 272,] 230 F.2d 810, 822 (CADC), certiorari denied [Panhandle Eastern Pipe Line Co. v. City of Detroit, Mich.] 352 U.S. 829 [77 S.Ct. 34, 1 L.Ed.2d 48]. * * * (Emphasis added.)

On March 7, 1961, however, the Commission's decision in Northern Natural Gas Co., 25 F.P.C. 431, reversed its former position, which we had approved,

and refused to follow the City of Detroit case. It said, at page 437:

"The Panhandle (City of Detroit) case was considered by us shortly after the enactment of Section 168. At that time, neither we nor the courts were fully aware of all of the consequences which would result if moneys in the deferred tax accounts were considered as belonging solely to the company. Thus, the statement in the above quotation from the City of Detroit case that to permit the company to use the funds for income-producing purposes would not result in higher rates to the consumer has on more careful consideration [by the Commission] been disclosed to be erroneous."

The City of Detroit case was decided by the Commission on December 4, 1953, so it was not considered "shortly after" the enactment of Section 168, which was in 1950; and our opinion in the City of Detroit case was handed down in 1955. The Commission took the same position in its Phillips Petroleum decision on September 28, 1960. It appears, therefore, that after eight years of experience, the Commission must have been "fully aware of all of the consequences which would result if moneys in the deferred tax accounts were considered as belonging solely to the company," when it wrote its Phillips Petroleum opinion on September 28, 1960. Yet, less than six months thereafter, the Commission wrote the Northern Natural opinion reversing the position it had consistently taken from December, 1953, to late September, 1960; and the majority now approve their change of heart "in the light of greater experience with the operation of § 167." [9]

As the Commission's initial ruling in December, 1953, was followed by it several times and as late as September 28, 1960, after eight years of experience

---

9. The majority speak only of Section 167, the liberalized depreciation provision, enacted in 1954. Section 168, dealing with accelerated amortization, was enacted in 1950. The principles governing the application of the two sections to regulated companies is admittedly the same. Both sections are involved here because Panhandle's tax reserves come from both sources. See footnote 7.

with the depreciation statutes, clearly the Commission's departure from it on March 7, 1961, was not due to greater experience with their operation. It was merely an abrupt change of mind. Moreover, this court has had no experience with this problem since the City of Detroit case, so I conclude the majority are acting on the erroneous impression that its change of view was justified by the Commission's fanciful "greater experience."

After saying in the above quotation that our City of Detroit opinion was erroneous, the Commission's Northern Natural decision continued thus, at page 439 of 25 F.P.C.:

"In our view, *the best solution to this problem is to divide the benefits of liberalized depreciation between the regulated company and the ratepayer.* In dividing these benefits between the ratepayer and the company, we are guided by the principle that it is our duty to protect the consumer, and adopt ratemaking principles which will assure the lowest possible rates. Accordingly, we believe that the major portion of the benefits accruing from the use of liberalized depreciation should go to the ratepayer, and the company should be allowed only so much of the benefits accruing from the use of liberalized depreciation as is necessary to provide it with a sufficient incentive to continue to use liberalized depreciation, and not return to the use of *straight-line depreciation in the computation of its income taxes.* \* \* \* " (Emphasis added.) [10]

Chairman Kuykendall of the Commission dissented from the paragraph just quoted from the Northern Natural decision

sion. After reproducing it, he said, at page 446 of 25 F.P.C.:

"It is our duty to apply the law (that is section 167 of the Internal Revenue Code), and not our discretion, to the facts before us. We have only the legislative powers which Congress has given us, and have no power to amend section 167, distributing as we see fit the advantages given to the taxpayer by this statute.

"We should, as the language of the Court of Appeals in the City of Detroit case, supra, quoted by the majority, clearly states, allow the taxpayer the full advantage of the tax deferral, but without any disadvantage to the ratepayer. The fact that the court did not mention, and may not, in fact, have considered the possible tax deduction arising by virtue of payment of interest on borrowed money does not alter the principle involved.

"My colleagues seem to assume that the amounts accumulated through the deferral of taxes would otherwise be obtained through borrowing, or that, in any event such sums should be treated as the equivalent of debt capital. In my opinion, this is error. Such funds actually are as much or more akin to equity than to debt capital. We recognized this fact in our Order No. 203 amending our uniform system of accounts, 19 FPC 826, where we considered the possibility of setting up the reserve account as earmarked surplus. Our prohibition against payment of dividends from these funds would seem to presuppose that such sums are included in surplus."

After distinguishing the El Paso case,[11] relied on by the majority of the Commission, by pointing out that the problem

---

10. On March 8, 1961, one day after its Northern Natural decision, which dealt only with liberalized depreciation, the Commission in Kansas-Nebraska Natural Gas Co., 25 F.P.C. 448, reached the same conclusion with respect to accelerated amortization.

11. El Paso Natural Gas Co. v. Federal Power Comm., 281 F.2d 567 (5th Cir. 1960), cert. denied, State of Cal. v. Federal Power Commission, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961).

there was whether liberalized depreciation constitutes a tax saving or a tax deferral, Chairman Kuykendall concluded by saying, at page 447 of 25 F.P.C.:

"The views I have expressed herein are, I believe, consistent with section 167 and its legislative history, with the only two court decisions which are controlling (City of Detroit and El Paso, supra), and are fair to the ratepayer; yet they do not constitute a usurpation of the constitutional power of Congress."

In the El Paso case the Fifth Circuit discussed the treatment given by the Commission to the tax "saving" or deferral resulting from the use by the taxpayer of the declining balance method of depreciation of new equipment and said, at pages 573–574 of 281 F.2d:

" * * * In practical effect this works a tax deferral rather than a tax savings. If the company were charged for rate making purposes with such 'savings' during the year in which the depreciable assets were acquired, and the rate resulting from such treatment of the taxes was thereafter used for later years, as is here the case, it is clear that the company would be paying higher taxes in subsequent years than in the test year, *but would not be entitled to an adjustment in rates to cover the increase*. Therefore, we approve the Commission's treatment of the 'saving' resulting from using the declining balance method of depreciation for tax purposes but computing its taxes for rate making purposes on the staight line method of depreciation, placing such 'savings' in a special reserve to be used to equalize tax payments in later years. These amounts can never represent added return to the company because of the restriction as to their use." (Emphasis added.)

The only restriction as to the use of the tax deferrals is that they may not be disbursed by way of dividend. They may be invested in facilities which become a part of the rate base just as any other equipment. When the Fifth Circuit said, "These amounts [tax deferrals] can never represent added return to the company [because they may not be paid out as dividends]," it was of course not saying the company could not earn a fair return on the facilities in which "these amounts [the tax deferrals]" are invested. For, if that were not permitted, a regulated company, forbidden by the Commission to distribute tax deferrals as dividends, could obtain no benefit whatever from Sections 167 and 168, and the Congressional intention to give it the sole benefit would be completely frustrated. That intention is proportionately defeated when, as here, a part of the benefit is taken away from the regulated company and given to its customers.

I come now to the proceeding in which the order presently under review was entered. On September 10, 1959, Panhandle filed with the Commission proposed increased rates including the usual rate of return upon the facilities acquired with tax accruals. As outlined above, this treatment of such accruals had been established for several years and was reaffirmed by the Commission on September 28, 1960, while Panhandle's proposal was pending. After hearings, the Commission abandoned the position previously taken in several cases and issued an order March 20, 1961, disallowing the proposed rates. It found proper a 6.25 per cent return on transmission facilities and said the finding was based, in part, upon its determination "that a factual statement of a pipeline company's capital should include the amounts accumulated in the restricted account for deferred taxes, and that a net return of 1.5 per cent should be attributed to such amounts." [12]

This was, of course, a division of the benefits of accelerated amortization and liberalized depreciation between the regulated company and its customers, which the Commission had said in the Northern

12. 25 F.P.C. 550 (1961).

Natural case is the "best solution." In the City of Detroit case, however, the question whether the benefits resulting from accelerated amortization should be divided between the company and the ratepayers was presented, and was answered in the negative by the Commission and by this court.

From this it is clear that in answering the question differently in its Northern Natural opinion, the Commission deliberately refused to follow this court's City of Detroit holding which sustained its former position. It has done the same thing in the present case. In argument here, the Commission asserts and attempts to show that the order under review is "entirely consistent with" our City of Detroit decision. Yet it says:

"* * * The breadth of some of the Court's language must be assumed to have resulted from the parties' and the Court's failure fully to anticipate the issue of the present case and thus fully to appreciate the potential future ramifications of the tax normalization treatment approved in City of Detroit."

and adds that:

"* * * [W]hile the decision in City of Detroit was sound, the opinion should be reexamined with a view to recognition of the *basically dynamic and fluid effect* of accelerated amortization and liberalized depreciation. * * * (Emphasis added.)

\* \* \* \* \* \*

"* * * The Court should make it clear that the law does not prohibit regulatory action which would allow ratepayers to participate in the benefit from a utility's use of accelerated amortization and liberalized depreciation for federal income tax purposes. * * *"

The majority opinion now declares the law to be as contended for by the Commission in the paragraph last quoted. I suggest this cannot be done without expressly overruling the City of Detroit case, which the majority have not done.

Instead, they seek to distinguish it by saying,

"* * * But the question of what return, if any, should be allowed on reserve funds included in the rate base was not before us in City of Detroit. It is the sole question presented in this case."

This is not an accurate statement of the tax deferral question presented in the City of Detroit case and in this case. In the former, the question was whether the benefits resulting from accelerated amortization should be divided between the pipeline company and its customers. As I have pointed out—and I repeat the quotation for emphasis—we answered the question in the negative by saying, 97 U.S.App.D.C. at 272, 230 F.2d at 822:

"* * * [T]he Commission * * * concluded, we think correctly, that the intent of Congress reflected in section 124A [168] is not to benefit consumers but rather the taxpayer in order to encourage construction of certain emergency types of facilities. Were the tax savings deducted from the rate base, the taxpayer here would not receive the intended benefit. The valuations upon which it is entitled to earn a fair rate of return would be decreased by the amount of the savings. In placing the savings at the disposal of Panhandle under the limitations specified, the Congressional intent is effectuated. The funds go into a reserve account for the payment of the deferred taxes to accrue after the five year amortization period. Though thus earmarked, the funds are available for income-producing purposes. Unless this is permitted, it is difficult to see how Panhandle could benefit substantially from section 124A. This statute, unlike the Natural Gas Act itself, is not for consumer benefit. It has a different public policy and should be given effect as intended by Congress. Furthermore, the solution of the Commission does not result in higher rates to the consumer. It simply

does not operate to reduce them. It aids Panhandle but neither aids nor harms petitioners. We think this is the result sought by Congress."

The question in this case is not, as the majority states, "what return, if any, should be allowed on reserve funds included in the rate base." It is, rather, whether the Commission was correct in dividing the benefit resulting from accelerated amortization and liberalized depreciation between Panhandle and its customers in the face of our City of Detroit opinion. There can be no question that the Commission did exactly that. In the first place, it is obvious that the allowance of a return of 1.5 percent on facilities acquired with tax deferrals amounts to dividing the benefit between Panhandle and its customers. In the second place, the Commission said in its Northern Natural decision that it had decided "to divide the benefits of liberalized depreciation between the regulated company and the ratepayer"; as the order under review was based on the Commission's Northern Natural case, it is of course true that the restrictive return of 1.5 per cent was fixed in pursuance of the Commission's determination to divide the benefit between Panhandle and its customers.

This truth cannot be escaped by saying the question was merely "what return, if any, should be allowed on reserve funds included in the rate base." By allowing a return of only 1.5 per cent on facilities acquired with tax deferrals, the Commission has in effect withdrawn a substantial portion of those facilities from Panhandle's rate base, and has given to the ratepayer a large part of the benefit of the tax deferral program which Congress intended to give to the taxpayer. As I have said, it is obvious that 1.5 per cent is not the full return which would have been allowed if the Commission had not decided to divide the benefit between Panhandle and the ratepayers.

The majority opinion, in saying the "sole question" in this case is "what return, if any, should be allowed on reserve funds included in the rate base,"

rejects what both the Commission and Panhandle agreed was the issue. In a pre-hearing stipulation the parties agreed this question was presented:

"Was it error for the Federal Power Commission to allow a return of 1.5% on the portion of the rate base financed by funds representing the difference between the income taxes which Panhandle would have been required to pay without liberalized depreciation and accelerated amortization, as provided by Sections 167 and 168 of the Internal Revenue Code of 1954, and the taxes actually paid, which funds are recorded in restricted accounts entitled 'Accumulated Deferred Income Taxes'?"

That is to say, was it error for the Commission to allow a return of 1.5 per cent on the portion of the rate base financed by tax deferrals and thus divide the benefit resulting from Sections 167 and 168 between Panhandle and its customers? That is the true question here, and I suggest it was answered by our City of Detroit opinion.

In another attempt to distinguish this case from that one, the majority say in their footnote 4:

"* * * We held [in the City of Detroit case] that the Commission properly included such reserves in the rate base. The present case is distinguishable. Here the Commission seeks only to limit the rate of return of such reserves. * * *"

The statement from the City of Detroit opinion, which I have already quoted twice, was much more than a decision that the Commission properly included the tax reserves in the rate base. We affirmed the Commission's conclusion that the intent of Congress in Section 124A [168] was not to benefit consumers, as was explicitly recognized in the City of Detroit case, but to encourage all taxpayers, both regulated and unregulated, to modernize and expand their facilities. That conclusion was the basis of the Commission's rejection of Detroit's con-

tention that the benefit should go to Panhandle's customers or be divided with them—a rejection which we affirmed in unequivocal language because we recognized the Congressional intention to give all the benefit to the taxpaying company. But now the majority necessarily limit the plain language of the City of Detroit opinion in order to limit the operation of the statutes. In footnote 4, the majority not only attempt to distinguish that case, as I have said; they also brand its holding as dictum by saying it "uses language broader than required for the decision on this aspect of the case." Because of this branding—or misbranding—the majority say:

> " * * * [W]e are not constrained to read the case as deciding that in all circumstances and in the light of greater experience with the operation of § 167 the greatest possible benefit should inure to the producer [sic] and none at all permitted to the consumer. * * * "

They also say:

> " * * * Nothing in the language or legislative history [of Section 167] indicates that Congress considered its regulatory consequences. * * * "

By the same token, nothing in the language or legislative history of Sections 167 and 168 indicates that Congress did *not* consider their regulatory consequences. Congress made those sections general in application, with their benefits available to regulated companies as well as unregulated businesses; this is beyond dispute. Indeed, it was admitted by the Commission in the Amere case, 15 F.P.C. at 782:

> " * * * It is undisputed that section 167 of the Internal Revenue Code does apply, and was intended to apply to regulated natural gas companies, such as the petitioners."

The majority err, I think, and go beyond their province when they say the sections, though general in language, do not apply literally to regulated companies because their language and legislative history do not show Congress considered their "regulatory consequences."

Before the Commission changed its position, it said in its Amere opinion, supra at 782, of 15 F.P.C.:

> " * * * The argument that the sums in the reserve account will rightfully belong to the rate payers, or that the rate payers will bear any burden they do not now bear, by reasons of the creation of the reserve, is wholly erroneous. * * * "

Then it added this significant language:

> "We cannot strike down an act of Congress if we think it unwise, or unnecessary to a particular industry, and enforce it only if it is in accord with our economic and regulatory philosophy. * * * "

Yet in the Northern Natural case, and in the order in the present case, the Commission substantially amended Sections 167 and 168 by denying their full benefit to regulated companies. Its brief in this case says the City of Detroit case "should be reexamined with a view to recognition of the basically dynamic and fluid effect of accelerated amortization and liberalized depreciation." And the majority opinion supports that position by saying that Congress did not consider the regulatory consequences of Sections 167 and 168. This amounts to saying that Congress made a mistake in making those sections fully applicable to regulated natural gas companies—as it clearly and admittedly did—and that the Commission and this court have the right to amend the sections in accord with their "economic and regulatory philosophy." I cannot agree to either of these propositions.

The majority cannot escape the plain and simple fact that their action actually reduces the rates to the customers, because it gives them the benefit of the tax deferrals in the early years without requiring them to bear a corresponding burden in the later years. So, Sections 167 and 168 are transformed into rate-reducing provisions as to regulated companies, although the unregulated com-

panies enjoy the full benefit conferred by them. In this way, the Congressional enactments are amended by the majority, and the City of Detroit case is overridden, although not expressly overruled. It is sheer sophistry to pretend that the court is not overruling the City of Detroit case.

Congress intended in these sections, as the majority admit, to "assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." It sought to accomplish that by offering to the taxpaying company accelerated amortization and liberalized depreciation. But the Commission and the majority of this court are saying that, with respect to regulated companies, this objective may be attained by offering to them only a small part of the advantages of accelerated amortization and liberalized depreciation—only as much as they think will encourage regulated companies to modernize and expand capacity.

My point here is that the Commission and the majority of this court do not have authority to decide that, although Congress offered unequivocally a definite benefit to encourage taxpayers to modernize and expand their facilities, the same result may be achieved by offering only a part—indeed, a small part—of the designated benefit to regulated companies. After all, it is for Panhandle, and not for the Commission and this court, to decide whether to take advantage of Sections 167 and 168. Panhandle had the right to say, as it did, that it would not elect to compute its income taxes under those sections unless it could retain the benefit accruing therefrom. But now the majority are holding that 1.5 per cent return on the facilities acquired by reliance on the Commission's assurances is enough to cause Panhandle to make the election. To me, this is patently beyond the power of the Commission and the court, and contrary to the clear language of the statutes.

The majority further say:

" * * * The Commission's decision does not disturb this acceleration; it relates only to the rate of return allowed a regulated company on the reinvestment of the money thus recovered. * * * "

In other words, they are saying to Panhandle, "You may still use the accelerated depreciation sections, but you may not derive therefrom the benefit Congress intended to confer thereby." This is worse than consoling a widow, when the dividends upon which she is dependent are passed, by saying to her, "After all, you still have your stocks." The widow's dividends may be resumed, but Panhandle can never get more than a fraction of the benefit of the statutes.

In its footnote 5, the majority speaks of "other material advantages" which the Commission thought Panhandle will enjoy from being forced to share the benefits of the statutes with its customers. These "other material advantages" do not compensate Panhandle for the loss of a fair return on facilities acquired with tax deferrals.

In addition to what precedes, I suggest that the Commission's action in its Northern Natural case and in this case exceeded its authority. Its determination in an earlier Panhandle case, pursuant to a rule it had previously announced, that Section 168 confers benefits on the regulated companies and not on their customers, as a consequence of which it could not divide the benefits between them, was affirmed by our City of Detroit case. The present case involves the same parties, the same sort of facilities, and the same issues. It would seem that our prior decision should control. But the Commission, having thereafter decided it best "to divide the benefits of liberalized depreciation between the regulated company and the ratepayer," for the second time rejected our City of Detroit case as erroneous, and gave a major portion of the benefits to Panhandle's customers.

A similar reversal of a prior administrative determination which had been judicially approved was forbidden by the Eighth Circuit in National Labor Relations Bd. v. Brown & Root.[13] In an initial proceeding, the Labor Board treated two corporations as separate employers, and in the ensuing review the Eighth Circuit's decision was based upon its conclusion that the two companies were not a single employer. Despite this, the Board, in a second proceeding, held that the two corporations were a single employer. But the Eighth Circuit held that the question whether they were one employer or two employers was necessarily involved in the prior proceeding in which both the Board and the court treated them as two; that therefore the Board was precluded from holding in the later proceeding that they constituted a single employer. The court quoted the general rule on the conclusiveness of judgments which was thus stated in Henderson v. United States Radiator Corp.: [14]

" * * * Any right, fact or matter in issue and directly adjudicated, or necessarily involved in the determination of an action before a competent court in which a judgment or decree has been rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the same parties and their privies, whether the claim, demand, purpose or subject-matter of the two suits is the same or not."

As has been shown, Panhandle sought, obtained and relied upon the Commission's determination *in a rule-making proceeding* that it would be permitted to retain the benefits of Sections 167 and 168, before electing to adopt the accelerated amortization and liberalized depreciation authorized therein. It made clear to the Commission it would not feel justified in making the elections without official assurance of full benefit therefrom. For the Commission, in any circumstances, to repudiate its assurances to Panhandle seems at least inequitable; to do it by presuming to overrule a decision of this court, is, I think, unconscionable. Why the majority aid and abet the Commission's act while asserting they are not repudiating the City of Detroit case is difficult to fathom.

For these reasons, it seems clear to me that the order under review is erroneous and should be reversed. Therefore, I dissent.

---

13. 203 F.2d 139, 146 (1953).

14. 78 F.2d 674, 675 (10th Cir. 1935).