ALABAMA–TENNESSEE NATURAL
GAS COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 21610.

United States Court of Appeals
Fifth Circuit.

March 25, 1966.

**322**

Christopher T. Boland, Stanley M. Morley, Francis H. Caskin, May, Shannon & Morley, Washington, D. C., for petitioner.

Lawrence H. Gall, Harry L. Albrecht, Washington, D. C., for Independent Nat. Gas Ass'n of America, amicus curiae.

G. R. Redding, Baker & Daniels, Indianapolis, Ind., Raymond N. Shibley, Patterson, Belknap & Farmer, Washington, D. C., for Panhandle Eastern Pipe Line Co., amicus curiae.

J. J. Danaher, Fort Lauderdale, Fla., Chas. F. Wheatley, Jr., Gen. Counsel, American Public Gas Ass'n, Washington, D. C., Mathias M. Mattern, Asst. Corp. Counsel, Chicago, Ill., for American Public Gas Ass'n and City of Chicago, amici curia.

George Spiegel, Reuben Goldberg, Washington, D. C., for Tennessee Valley Municipal Gas Ass'n, intervenor.

W. P. Gilbert, Stephen L. Seftenberg, Wilson & McIlvaine, Chicago, Ill., for Arthur Andersen & Co., amicus curiae.

Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel, Abraham R. Spalter, Asst. Gen. Counsel, Leonard E. Poryles, Washington, D. C., Atty., F. P. C., for respondent.

J. Calvin Simpson, Senior Counsel, Richard E. Tuttle, Chief Counsel, Sheldon Rosenthal, Associate Counsel, San Francisco, for People of State of California and Public Utilities Commission of State of California, amici curiae.

Before WISDOM and GEWIN, Circuit Judges, and BREWSTER, District Judge.

WISDOM, Circuit Judge:

Alabama-Tennessee Natural Gas Company, a federally regulated pipeline company, petitions the Court to review and set aside an about-face order of the Federal Power Commission.[1] This order establishes ratemaking principles reflecting the economic benefits the petitioner derives from using liberalized (accelerated) depreciation allowed the business community generally by Section 167 of the Internal Revenue Code of 1954.[2]

---

[1.] Opinion No. 417, 31 F.P.C. 208 (Feb. 3. 1964); rehearing and stay denied, Opinion No. 417–A, 31 F.P.C. 928 (April 15, 1964).

[2.] Congress enacted Section 167 as an investment incentive for the business community generally. It enables taxpayers to write off between two-thirds and three-quarters of post-1933 investments in the first half of a property's estimated life. In pertinent part, Section 167 provides:

"§ 167. Depreciation.

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income.

"(b) Use of certain methods and rates.—For taxable years ending after December 31, 1953, the term 'reasonable allowance' as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

"(1) the straight line method,

"(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),

"(3) the sum of the years-digits method, and

"(4) any other consistent method productive of an annual allowance

In a rate increase proceeding by Alabama-Tennessee, the Commission ruled that the company may no longer "normalize" [3] accelerated depreciation, accumulate reserves for the deferred tax liability, and receive a return on the amounts already accumulated. In addition, the Commission required Alabama-Tennessee to flow through to customers in the form of reduced rates the benefits resulting from liberalized depreciation. This ruling reverses the Commission's earlier ratemaking treatment of liberalized depreciation.[4] Fundamental to the Commission's decision is its finding that in a stable or expanding industry, such as the natural gas industry, accelerated depreciation results in true tax savings for the foreseeable future.

Alabama-Tennessee makes two main points. First, the petitioner contends that the challenged order [5] conflicts with the intent of Congress as expressed in Section 167 and therefore arbitrarily deprives the company of the benefits of congressionally sanctioned accelerated depreciation. Second, the petitioner contends that the Commission's procedures were unfair not only to the petitioner but to the entire natural gas industry. We reject these contentions. (1) Giving full weight to the Commission's broad responsibilities under the Natural Gas Act and its special competency to choose between competing theories of accounting for ratemaking purposes, on balance we must uphold the order. (2) The approach and methods the Commission adopted in this case invited adverse criticism, but we cannot say that the procedure was so

unfair and prejudicial as to have deprived the petitioner or the natural gas industry of a fair hearing.

\* \* \*

Alabama-Tennessee is one of the smallest interstate gas pipeline companies subject to the Commission's jurisdiction. Its pipeline system extends 140 miles from an interconnection with its sole supplier, Tennessee Gas Transmission Company, at a point near Selmer, Tennessee to its terminus at Huntsville, Alabama. Alabama-Tennessee serves five direct sales customers and fifteen small resale customers; all but one are municipal distributors. As of December 31, 1959, the company's net plant in service had a value of about $5,000,000 and an accumulated reserve for deferred taxes of $100,000.

The proceedings originated in four rate increase filings between 1954 and 1959 under Section 4(d) of the Act. Each of the filings was suspended by the Commission under Section 4(e). After suspension for five months, each became effective, subject to refund, until superseded. The Commission consolidated the four cases for a hearing that commenced July 13, 1960. The Tennessee Valley Municipal Gas Association intervened in opposition to each of the four increased rates. The intervenor introduced evidence to show that the excess of normalized taxes over actual taxes constitutes tax savings and not merely tax deferrals. Alabama-Tennessee did not object to this evidence and offered no evidence in rebuttal. The Commission introduced no evidence on this point.

---

which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

"Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a)."

3. See Section I–A of this opinion.

4. Less than three years before, the Commission specifically approved normalization and allowed a return of 1.5 per cent on the deferred tax reserves. See Northern Natural Gas Co., 25 F.P.C. 431 (1961).

5. The petitioner seeks review under Section 19(b) of the Natural Gas Act, Act of June 21, 1938. 52 Stat. 821–833, as amended (15 U.S.C. §§ 717–717w).

Alabama-Tennessee, in its application for a rehearing, explained that it did not introduce rebuttal evidence because at the time the hearing was held it had "no possible reason to contemplate the unprecedented action which the Commission has taken in this case". Indeed, both "Alabama-Tennessee and the Commission's staff made their evidentiary presentations on the assumption that the principles which the Commission had established with respect to liberalized depreciation could be relied upon. The Commission's rulings had been consistent since 1956".[6]

September 25, 1961, the Examiner issued his decision. He disallowed about $500,000 of $1,500,000 of proposed increases, but rejected the intervenor's contentions. He allowed normalization of income taxes and a 1.5 per cent return on the deferred tax reserve.[7] The intervenor excepted to this ruling and asked the Commission to reexamine its position on liberalized depreciation.

June 1, 1962, the Commission issued an order severing the issue of liberalized depreciation from other matters in the case and setting down that issue for special oral argument for July 10, 1962. The severance order provided, in part, that:

> "Specifically, we desire to hear arguments directed toward the several possibilities for handling this matter, namely, use of the present procedure with rates of return at 0, 1.5, or such higher rate as may be deemed to be in the public interest, or alternatively, use of the so-called '*flow-through*' principle under which the *reduction in taxes* through the use of liberalized depreciation instead of straightline depreciation, would be reflected in income taxes included in the pipeline's cost of service. We believe we would be aided in our consideration of this problem by the participation as *amici* either in the oral argument, or by the filing of written briefs, by any person, company, association or governmental authorities having an interest in the problem. * * * "

June 13, 1962, the Commission issued its order and Opinion No. 360, 27 F.P.C.

6. Amere Gas Utilities Co., 15 F.P.C. 760 (1956); El Paso Natural Gas Co., 22 F.P.C. 260, 265-69 (1959), reversed on other grounds in El Paso Natural Gas Co. v. Federal Power Commission, 5 Cir. 1960, 281 F.2d 567; United Fuel Gas Co., 23 F.P.C. 127, 130-31 (1960); Phillips Petroleum Co., 24 F.P.C. 537, 570 (1960); City of Detroit, Mich. v. Federal Power Commission, 1955, 97 U.S. App.D.C. 260, 230 F.2d 810, 821-22, cert. denied Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956). See also In the Matter of Treatment of Federal Income Taxes as Affected by Accelerated Amortization, 12 F.P.C. 369 (1953).

7. The examiner commented: "The Commission as a matter of policy has allowed the benefits of such liberalized depreciation to be retained by the pipeline company. In this connection it may be pointed out that liberalized depreciation, under Section 167 of the Internal Revenue Code, only shifts costs from one period to another. It does not relieve the taxpayer from the eventual necessity of paying such costs. The determination by a taxpayer as to whether to take advantage of such liberalized depreciation is a matter of sound business discretion and should be considered in relation to its effect upon the financial structure of the taxpayer, rather than upon any consideration of its effect upon third parties or the benefits which they might receive therefrom.

From the standpoint of customers of Alabama-Tennessee, the allowing of that company to retain the benefits of the liberalized depreciation which it is permitted to take under Section 167 of the Internal Revenue Code raises only one question and that is whether certain costs should be paid now by present rate payers or passed on to future rate payers when it becomes necessary for Alabama-Tennessee to meet the postponed liability incurred by it under the Federal Income Tax statutes. It appears equitable that these costs should be paid by the present rate payers rather than by some future generation of rate payers, at a time when gas rates will probably be much higher than they are now. It *is* therefore found that the retention by Alabama-Tennessee of the temporary benefits due to accelerated depreciation, as provided for in the Internal Revenue Code, is in the over-all public interest and should be permitted in these rate determinations."

1180, adopting the Examiner's decision on most issues but reserving for later decision the liberalized depreciation issue. Any change of policy on depreciation would be "applicable to Alabama-Tennessee's rates herein prescribed from and after the date of such decision."

The petitioner did not seek court review of that order; the petitioner objected, in an "Application for Rehearing", to the severance and special argument of the liberalized depreciation issue that would affect rates from April 4, 1960. The petitioner points out that these proceedings began in 1954; that they were not heard until 1960 in spite of strenuous efforts to have its applications disposed of expeditiously; that the matters were submitted to the Commission in October 1961 and were not finally ruled upon until June 13, 1962; that since the Commission has decided the rate-increase case, petitioner no longer has any matter pending before the Commission. The petitioner contends that the Commission has "no authority to continue this proceeding in an open-ended manner as a vehicle for instituting what is tantamount to a rulemaking proceeding concerning an issue of widespread interest and importance to the entire gas and electric industry but having applicability to a single company—Alabama-Tennessee." The petitioner challenges the validity of the Commission orders, the fairness of its procedures, and the propriety, of converting this minor rate case into a cause celebre in which "any person * * * having an interest" in the subject of the treatment of liberalized depreciation was "invited" into the proceeding. Without delay, the Commission denied the petition.[8]

May 16, 1963, after several delays, Alabama-Tennessee, the intervenor, and thirty-four *amici* participated in the oral argument on the liberalized depreciation issue. February 3, 1964, the Commission, by a bare majority,[9] issued Opinion No. 417 and the order here under review. In its opinion the Commission emphasized that for Alabama-Tennessee, the decision is "the final element in determining a just and reasonable level of return"; for the various other pipeline companies, the decision is only "a proposed" or "tentative decision". See F.P.C. Rules of Practice and Procedure § 1.30(b), 18 C.F.R. § 1.30(b).

The Commission made the following findings. (1) The use of liberalized depreciation under Section 167 of the Internal Revenue Code results in a "permanent reduction" of federal income taxes by natural gas pipelines maintaining either "a growing or stable plant." Alabama-Tennessee will "maintain a growing or stable plant for the foreseeable

---

8. The Commission stated, in part:
 "[T]he issues set for further briefing and argument were raised in these proceedings; and * * * contrary to the applicant's contention, that nothing is pending, Opinion No. 360 issued June 13, 1962, 27 FPC 1180, recites that the rates therein prescribed are subject to possible adjustment upon 'further argument as provided in the Commission's order of June 1, 1962 herein.' (Op. 360.) Alabama-Tennessee's failure to present evidence after the issues were raised and testified to by an intervener, was a matter of its own choice.
 In seeking to determine issues which are in controversy in the proceedings, we place no additional burden upon the respondent in the case. We are of the further view that in the resolution of those issues we may in our discretion request such aid as *amici* may be able to render. We believe Alabama-Tennessee's contentions to be without merit." 28 F.P.C. at 241.

9. Counsel for the Commission noted in his brief that four of the five members of the Commission were newly appointed and therefore had not previously struggled with the problem of liberalized depreciation. The five members of the Commission from October 13, 1961, when the exceptions were filed to the denial of rehearing on April 15, 1964, were Joseph C. Swidler, Chairman, who took office June 26, 1961; Howard V. Morgan, June 28, 1961; Jerome K. Kuykendall, May 16, 1953; Lawrence J. O'Connor, Jr., August 14, 1961; Charles R. Ross, September 29, 1961; Harold C. Woodward (vice Jerome K. Kuykendall), March 30, 1962; and David S. Black (vice Howard V. Morgan) August 30, 1963.

future". (2) "Congress did not attempt to prescribe the manner in which [the] Commission should reflect such tax benefits in rates established under the Natural Gas Act." (3) Rate flow-through will "effectively" meet "the fundamental objective of Section 167 to benefit the national economy by stimulating plant modernization and expansion". (4) Alabama-Tennessee should retain deferred tax balances accumulated in the past "as a contingency reserve (not a segregated fund) to offset any increased taxes in the future resulting from a decline in over-all tax depreciation deductions". (5) Alabama-Tennessee's prospective rates "should reflect only the actual taxes currently payable during the applicable test year" (1960), since there is no "present factual justification" for deferring taxes that normally would be payable under straight-line depreciation. (6) "Alabama-Tennessee and other natural gas companies similarly situated" are not entitled to the "specific return of 1.5 per cent to be earned upon the portion of the rate base equivalent in amount to the accumulated 'deferred tax

funds'"; indeed they are not entitled to any return upon such "consumer-contributed capital". Based on these findings the Commission ordered Alabama-Tennessee to file new rate schedules reflecting the lower federal income tax allowance and the lower rate base found to be just and reasonable.

April 15, 1964, in Opinion 417-A, the Commission denied Alabama-Tennessee's application for rehearing and for a stay.[10] The Commission explained that Opinion 417 did not constitute a rule of general applicability.[11]

Large sums are involved and are mounting. In 1960 when the Commission held its first hearing on the issue, the aggregate total of the accumulated tax reserves of natural gas pipeline companies was about $106 million. December 31, 1963, it was $304 million. The petitioner's reserve at that time was $213,651.[12]

I.

A. *Normalization/flow-through.* In the FPC's "rate base-rate of return" sys-

10. Alabama-Tennessee advised the Commission May 5, 1964, that it intended not to use liberalized depreciation commencing with taxes payable for 1963. By letter order of July 13, 1964, the Commission objected that this was a "single isolated factor affecting only the tax element of its over-all cost of service" and ordered Alabama-Tennessee to file reduced rates within seven days. Alabama-Tennessee filed with this court a motion of stay of the opinion and orders and requested the Commission to extend the time for filing the reduced rates until disposition of the appeal. The Commission granted the extension on the condition that the petitioner resume the use of liberalized depreciation for income tax purposes and continue use of the Commission's prescribed tax accounts pending the outcome of this proceeding.

11. "While the liberalized depreciation issue in the case is of general interest, the case is solely a determination of just and reasonable rates for Alabama-Tennessee. Precedents of wide application are customarily established in cases in which only a single company is a party. An administrative agency may of course pro-

ceed by a rule-making proceeding but it certainly is free to arrive at general principles of individual cases. No question could have been raised concerning the propriety and legality of our procedures even if we had heard argument from only the parties in this case. Certainly our action in inviting the participation of other interested persons as *amici* to give them an opportunity to participate in the decision on a precedent of possible industry-wide applicability does not mean that the Commission has committed error. The position maintained by INGAA leads to the paradoxical result that a regulatory body may determine a policy of broad import and substantial impact in an individual proceeding without hearing from interested persons who are not parties to the case but is in error if it affords all persons who may be affected an opportunity to present their views as *amici* prior to final decision."

12. These figures from the Commission's brief are based on the Commission's Statistics of Natural Gas Companies compiled from reports made in compliance with FPC regulations.

tem [13] the ratepayers of a regulated utility pay a rate sufficient to return to the utility the cost of service plus a specified rate of return on the utility's capital investment. Taxes are part of the utility's cost of service to be reimbursed by the ratepayers. When the depreciation is normalized, the ratepayers are charged not the actual income taxes paid but a hypothetical larger figure for the taxes computed as if depreciation were figured on a straight-line basis. The difference between the actual taxes paid and the larger hypothetical amount for taxes charged to the ratepayers is accumulated in a "deferred tax" account. The funds in this account are available to the company as working capital free of any charges for interest or dividends. As even the dissenting commissioners pointed out, these funds come from the ratepayers.[14] This raises the question whether the funds are capital entitled to a "return"; if so, at what rate.[15]

Under the flow-through treatment of liberalized depreciation, the ratepayers reimburse the utility for federal income taxes the regulated utility actually pays. The utility does not accumulate capital funds that are, in effect, enforced contributions from consumers. Flow-through is in accord with the established principle the Commission has "consistently held that consumers should be charged for only the actual liability for Federal income taxes. * * * " United Fuel Gas Company, 12 F.P.C. 251, 264–65 (1953).

■ Under traditional regulatory concepts, utility company shareholders (investors), not the consumers, furnish the capital necessary for the operation of the business. Railroad Commission of Louisiana v. Cumberland Telegraph and Telephone Company, 1909, 212 U.S. 414, 424, 29 S.Ct. 357, 53 L.Ed. 577; Lindheimer v. Illinois Bell Telephone Company, 1934, 292 U.S. 151, 169, 54 S.Ct. 658, 78 L.Ed. 1182. The consumer pays

13. "In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the Supreme Court approved use of the 'prudent investment' rate-base method for establishing rates to be charged by natural gas companies. * * * [R]ates are considered 'just and reasonable' if they will return to the company a certain percentage of profit on its rate base. The rate base is a figure representing the money prudently invested in the properties and equipment utilized in the company's transmission and production business. The percentage of profit prescribed by the Commission depends upon a variety of factors, such as the risks of the business, the necessity for attracting capital, and the desirability of lower cost of gas to the public. In order to return a profit on the rate base the rates are set high enough to recover all costs of service, including taxes, depreciation, depletion, and all operating expenses chargeable to production and transmission." City of Detroit, Michigan, v. Federal Power Commission, 1955, 97 U.S.App.D.C. 260, 230 F.2d 810, 813. See also Bonbright, Principles of Public Utility Rates, 147–283 (1961); Francis, Rate Regulation of Natural Gas Companies by the Federal Power Commission, 19 Law & Contemp.Prob. 413, 417–33 (1954).

14. " * * * Since this capital represented by the reserve for deferred Federal income taxes is available to the company without charge, no recovery is required for that component in estimating the cost of capital. * * * This is warranted * * * by the * * * fact that the funds for normalizing the tax expense and accumulating the reserve are derived from consumers rates. * * * [T]here is no cost for this capital. * * * " 31 F.P.C. at 231.

15. One authority has said: Normalization is "popular with the public utility industries since, from their point of view, it has the charm of imposing upon consumers the obligation to pay deferred-tax allowances which, instead of being transmitted forthwith to the United States Treasury, are to be treated as capital investments entitled indefinitely to the enjoyment of a 'fair rate of return' for the benefit of the corporate stockholders. * * * Support for this position of the industry has been forthcoming from the Federal Power Commission [citing Amere] and from a few state commissions. But I have never seen a plausible defense of this claim to the enjoyment of a profit on funds not contributed by the corporate investors." Bonbright, Principles of Public Utility Rates 220 (1961).

a fair return on the utility's capital and in addition pays the costs of operation including taxes, but:

"* * * [I]f the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers * * * are required to provide, in effect, capital contributions * * * to secure additional plant and equipment upon which the utility expects a return." *Lindheimer*, 292 U.S. at 169, 54 S.Ct. at 665.

Lifetime depreciation on a single item of property is of course the same whether the utility elects straightline or accelerated depreciation. Under conventional accounting principles, therefore, the full amount of the value of the item less salvage would be a deductible expense. Conventional accounting, however, does not take into consideration the effect of applying liberalized depreciation to a utility's total assets which are, of course, subject to a continuing cycle of obsolescence and renewal. If the industry is stable or expanding, requiring the utility's *continued reinvestment in plant equal to or in excess of plant retirement*, a

program of liberalized depreciation produces true tax savings because there is no reduction in the tax reserve fund.[16]

B. *Commission Policy and Judicial Review.* Initially, the Commission adopted the normalization approach for Section 168 of the Internal Revenue Code, providing for rapid tax amortization of emergency facilities to aid in mobilization for the Korean War.[17] Amere Gas Utilities Company, 15 F.P.C. 760 (1956), was the first case before the Commission after enactment of Section 167. In that case the presiding examiner found that use of a liberalized depreciation produced a tax savings not a tax deferral.[18] Notwithstanding, he approved normalization because he believed that Section 167 established a "formula for ratemaking which would result in all income tax savings becoming the property of the owners of the business rather than the ratepayer". 15 F.P.C. at 773. The Commission affirmed the examiner but did say that the "statutory formula", as applied to regulated utilities, was contrary to the Commission's regulatory philosophy and the "present traditional method" of treating depreciation expense.[19]

16. See Bonbright, Principles of Public Utility Rates, 218–223 (1961); Davidson, Accelerated Depreciation and the Allocation of Income Taxes, 33 Accounting Rev. 173 (1958); Comment, Liberalized Depreciation: About Face by the FPC, 50 Va.L.Rev. 298, 301 (1964); Note, Utility Ratemaking and Section 167, 69 Harv.L.Rev. 1097, 1102 (1956).

17. Int.Rev.Code of 1939, § 124A (now Int. Rev.Code § 168). Accelerated Amortization is "a grant by our government to a certificate holder of an interest free loan". The customers "will pay the same rates, no more, no less". Treatment of Federal Income Taxes as Affected by Accelerated Amortization, 12 F.P.C. 369 (1953).

18. "Consideration of the foregoing leads inevitably to the conclusion that assuming the continuation of the present statutory provisions, and assuming the continuation of at least some growth in petitioners' plant (that unless an assumption is made no purpose will have been served by petitioners' proposal), the aggregate annual depreciation under one

of the liberalized depreciation methods will always be greater than under the straight-line methods, and under the former the accumulated depreciation will always be greater than under the latter. Under such circumstances there would never be a reduction in the overall income tax reserve but rather the freezing of income tax payments at amounts less than would otherwise be required. The result is, it is believed, properly characterized a 'tax saving.'" (15 F.P.C. at 773.)

19. "We cannot strike down an act of Congress if we think it unwise, or unnecessary to a particular industry, and enforce it only if it is in accord with our economic and regulatory philosophy. It is undisputed that Section 167 of the Internal Revenue Code does apply, and was intended to apply to regulated natural gas companies, such as the petitioners.

"The extraordinary ability and willingness of natural gas companies, including petitioners, to attract capital and construct new facilities causes us to ques-

Until the Alabama-Tennessee proceeding, Commission rulings religiously followed *Amere*. El Paso Natural Gas Company, 22 F.P.C. 260 (1959),[20] involved both Sections 167 and 168. The Commission held that the Examiner "followed the intentions of Congress in permitting El Paso to retain the * * * tax advantages;" each section permits normalization for ratemaking purposes. The congressional intent was "conclusive". In Northern Natural Gas Company, 25 F.P.C. 431 (1961),[21] the FPC allowed normalization but permitted a return of only 1.5 per cent on the accumulated tax deferral funds. In Kansas-Nebraska Natural Gas Company, 25 F.P.C. 448 (1961),[22] in a Section 168 case, the Commission gave its blessings to use of tax deferrals for income-producing purposes. Shortly after this decision, the Commission applied the 1.5 per cent return to accumulated tax deferrals of Panhandle Eastern Pipe Line Company, 25 F.P.C. 550 (1961).[23]

When these cases reached court review, the courts accepted the Commission's policy of allowing normalization as an informed judgment within the special competency of a regulatory agency. Without exception, however, the courts put the Commission and the natural gas industry on notice that for ratemaking purposes Section 167 was not a congressional mandate to regulatory agencies to approve normalization.

■ In El Paso Natural Gas Company v. Federal Power Commission, 5 Cir. 1960, 281 F.2d 567, cert. denied sub nom. State of California v. Federal Power Commission, 1961, 366 U.S. 912, 81 S.Ct. 1083, this Court affirmed the Commission's approval of normalization of taxes. But we rejected the notion that normalization is necessary to effectuate the congressional objective expressed in Section 167. Speaking for the court, Judge Tuttle said:

"* * * The requirement that the Commission determine a just and reasonable rate is not modified by reading into the [Natural Gas Act] an exception to the extent that the prices charged may be sufficient to afford a just and reasonable rate *plus* an amount representing a savings in taxes granted to the gas industry. *We think there is nothing in the legislative history that would warrant our concluding that Congress intended the statutory depletion, deduction of intangible drilling expense, and rapid depreciation provisions of the Revenue laws to amend or modify the express language of the Natural Gas Act * * *"* 281 F.2d at 572.

Continuing, this Court observed that "there is no statutory authority for the Commission to treat actual savings in taxes to which natural gas companies are entitled any differently from savings in any other cost of service. * * * Such savings as are effected are passed on to the consuming public". 281 F.2d at 573. In discussing the depletion allowance we made it clear that tax benefits need not be translated into additional profits over and above a reasonable return on the utility's investment. We emphasized that tax benefits "are available to the regulated companies to make it so much the easier for them, in competition with

---

tion whether the incentive provided by section 167 of the Internal Revenue Code is necessary or desirable for this industry or will, in the long run, be as beneficial to the public interest *as is the present, traditional method of treating depreciation expense.*

"We are calling this situation to the attention of the Congress by transmitting copies of the presiding examiner's decision, our opinion herein, and the dissenting opinion attached hereto, to the chairman of the Finance Committee of the Senate and the chairman of the Ways and Means Committee of the House." (15 F.P.C. at 782; emphasis supplied.)

20. El Paso Natural Gas Co. v. Federal Power Commission, 5 Cir., 1960, 281 F.2d 567, cert. denied, *sub nom.* State of California v. Federal Power Commission, 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236.

21. Review was not sought.

22. Ibid.

23. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 1963, 115 U. S.App.D.C. 8, 316 F.2d 659.

**330**

other fuels and in competition with other industries seeking the investor's dollar to earn a fair return, including the substantial increment of incentive for exploration and development and payment for gas consumed". 281 F.2d at 571. This analysis applies equally to the tax benefits of rapid depreciation. Full effect must be given to the congressional purpose to make depreciation options available to the petitioner; but the specific incentives provided by the Internal Revenue Code must be reconciled with the general scheme of regulation of gas pipelines under the Natural Gas Act.

Before this Court decided El Paso Natural Gas Company the Commission ruled on another Section 167 case, United Fuel Gas Company, 23 F.P.C. 127, 512 (1960). When this case reached the Fourth Circuit, as Cities of Lexington, etc. v. Federal Power Commission, 4 Cir. 1961, 295 F.2d 109, the Court noted that there were competing theories as to the rate treatment of liberalized depreciation at both federal and state levels. The Fourth Circuit, like the Fifth Circuit, affirmed the Commission's adoption of normalization, not as required by a congressional mandate but as a matter within the FPC's regulatory discretion under the Natural Gas Act:

> "It is obvious that we are confronted in this case with a problem in a special field which requires the exercise of expert skill that has been generally entrusted by state and Federal legislation to administrative regulatory tribunals whose decisions, in the absence of abuse of discretion, should be followed by the courts. We adopt that course in this case." 295 F.2d at 114.

The District of Columbia Court of Appeals agreed with the Fourth and Fifth Circuits. In Panhandle Eastern Pipe Line Company v. Federal Power Commission, 1963, 115 U.S.App.D.C. 8, 316 F.2d 659, cert. denied, 375 U.S. 881, 84 S.Ct. 147, 11 L.Ed.2d 111, the Court held that the rate of return permitted utilities on reserve funds accumulated under the prior rule of normalization was within the expert competence of the Commission, but made it quite clear that nothing in Section 167 dictated the regulatory treatment of liberalized depreciation.[24] The Court said:

> "We now briefly consider the policy underlying § 167 of the tax statute. *Nothing in the language or legislative history indicates that Congress considered its regulatory consequences.* Thus, to infer that the statute materially altered fundamental principles of rate regulation—which require rates to reflect actual costs of capital—it must clearly appear that Congress intended to benefit producers to the exclusion of consumers. It does not so appear: the legislative history reveals that Congress intended the statute 'to have far-reaching economic effects' extending to 'all segments of the American economy.' Liberalized depreciation was seen as a means toward a broad economic goal; it was expected to 'assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living.' " 316 F.2d at 662.

In short, as the Commission accurately stated in its brief: *El Paso Natural Gas Company* [and other cases] "purged [the Federal Power Commission] of the erroneous legal view which it had previously believed compelled a contrary result" and "freed the Commission's hand to make the instant reevaluation of the problem".

24. In City of Detroit, Mich. v. F. P. C., 1955, 97 U.S.App.D.C. 260, 230 F.2d 810, the court held that the intent of Congress in enacting what is now section 168 of the Internal Revenue Code (Amortization of Emergency Facilities) was to benefit taxpaying producers and not their consumers. In *Panhandle Eastern Pipe Line* the court limited its

City of Detroit holding: "We are not constrained to read the case as deciding that in all circumstances and in the light of greater experience with the operation of § 167 the greatest possible benefit should inure to the producer and none at all permitted to the consumer." 316 F. 2d at 662, n. 4.

C. *Legislative History.* The legislative history of Section 167 is as unmalleable as granite. With great diligence, however, counsel for both parties, amici, and this Court labor to prove the truth of Chief Justice Marshall's axiom: "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived." United States v. Fisher, 1805, 2 Cranch 358, 6 U. S. 358, 386, 2 L.Ed. 304.

■ For purposes of this case, as we see it, the most important fact in the legislative history of Section 167 is the long reach of the Natural Gas Act. Congress might have reduced that reach through the expedient of a statutory direction requiring the regulatory agencies to allow taxpayers to retain all the economic benefits of liberalized depreciation. However, in view of the extensive regulatory scheme entrusted to the Federal Power Commission and to other federal regulatory agencies, one would expect Congress to speak out loud if it had intended Section 167 as a limitation on agency ratemaking powers. In the absence therefore of clear congressional directives with regard to ratemaking, the Commission was within the statutory purposes in giving effect to Section 167 only to the extent that is appropriate within the principles established in the Natural Gas Act.

■ The central principle in the regulation of the natural gas industry around which all ratemaking revolves is

"the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption * * * at the lowest possible reasonable rate consistent with the maintenance of adequate service on the public interest".

This is the language of Section 7(c) of the Natural Gas Act as originally enacted in 1938. The provision was deleted when the subsection was amended in 1942 but, as the Supreme Court has held, the amendment was not intended to change the congressional purpose of the Act; the "primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies." Federal Power Commission v. Hope Natural Gas Company, 1944, 320 U.S. 591, 611, 64 S.Ct. 281, 291, 88 L.Ed. 333. Again, as Justice Clark reiterated twenty-five years later: "The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges". Atlantic Refining Company v. Public Service Commission, 1959, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed. 2d 1312.

■ The fixing of "just and reasonable rates" is the heart of the regulatory system, including specifically the power to investigate and ascertain the "actual legitimate cost" of property. Natural Gas Act § 6(a), 15 U.S.C. § 717e (a) ; Federal Power Commission v. Hope Natural Gas Company, 320 U.S. at 601, n. 8, 64 S.Ct. 281. The Commission is not bound to use any single formula or combination of formulae in determining rates; its ratemaking function involves the making of "pragmatic adjustments". Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 86 L.Ed. 1037, 1050. "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. * * * It is the product of expert judgment which carries a presumption of validity." Federal Power Commission v. Hope Natural Gas Company, 320 U.S. at 602, 64 S.Ct. at 288. Since Congress has expressly delegated to the Commission discretionary power to regulate rates in the natural gas industry, Section 167 could operate as a limitation on the Commission only to the extent that exercise of the option to use liberalized depreciation does not interfere with the FPC's duty to fix "just and reasonable rates". It is at least a fair construction of the general statutory purposes and the legislative silence on the concrete situation before us that Congress did *not* intend to fetter administra-

tive discretion to the point where the Commission would be powerless to prevent a regulated company using Section 167 as an excuse to charge excessive rates.

■ There is no evidence that at the time Section 167 was enacted Congress even focused on the problem in terms of reducing the dimensions of the Federal Power Commission's regulatory responsibility to protect consumers from excessive rates.[25] The general rule of Section 167, as of its 1939 Code predecessor, is that the taxpayer be accorded "a reasonable allowance" for depreciation. The effect of the section is to include as a "reasonable allowance" several specific forms of rapid depreciation, including but not limited to the straight-line, declining balance, and sum of the years-digits methods. The stated purpose is to "increase available working capital and materially aid growing businesses in the financing of their expansion." S.Rep. No. 1622, 83d Cong., 2d Sess. 26 (1954) U.S.Code Congressional and Administrative News, p. 4656. Congress expected liberalized depreciation to "assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." Ibid. Rapid depreciation is not made compulsory; it remains elective. Straight-line depreciation is expressly approved as an alternative, and provision is made for transfer to the straight-line method at any time by the

taxpayer.[26] The House Report declares that the liberalization would "merely affect the timing and not the ultimate amount of depreciation deductions with respect to *a property*." H.R.Rep. No. 1337, 83d Cong., 2d Sess. 25 (1954) (Emphasis added). Both the President and Congress emphasized that the incentive provided in Section 167 was a postponement of federal income taxes. There is not the slightest indication of a suggestion of providing permanent tax savings. The Commission's finding in this case, therefore, that the use of liberalized depreciation resulted in "true savings" to Alabama-Tennessee for the "foreseeable future" is critical. To permit such savings would be inconsistent with the statements frequently made in the floor debates and in the committee reports that the section was not intended to affect the total deductions.

■ There is nothing in any of the committee reports showing that Congress considered "the ultimate amount of depreciation deductions" with respect to the *total* depreciable property of a utility. And, although rapid depreciation increases available working capital in the business community generally, there is no evidence of a congressional purpose to override the Commission's *ad hoc* power to tailor a utility's return to the facts of the individual case, consistent with the capital costs and financial integrity of the enterprise. Congress made the tax benefit available; it is for the

---

25. In a recent comment, Liberalized Depreciation: About-Face by the FPC, 50 Va.L.Rev. 298, 320, 325 (1964), the author reached the conclusion that the Commission's decision in the instant case is "in conflict" with the intent of Congress. The author effectively demonstrates that the legislative history of Section 167 shows "an intent to stimulate the economy by, in effect, placing extra working capital in the hands of producers. He concedes however that "there is very little which helps answer the question of what application this section was to have in the field of public utility ratemaking"; but nothing in the reports or the debates indicates that section 167 was not intended to apply to public util-

ities. See also, in accord, Flittie and Armour, The Natural Gas Experience— A Study in Regulatory Aggression and Congressional Failure to Control the Legislative Process, 19 Sw.L.J. 448, 495–99 (1965). On the other hand, another commentator has concluded that "the issue is not clarified by a debate as to whether or not Congress intended that these benefits be retained by regulated utilities"; that "the legislative history of Section 167 of the Code is specific only in evincing a congressional purpose to defer rather than to excuse the payment of taxes." Swiren, Accelerated Tax Benefits in Utility Rate Making, 28 U. Chi.L.Rev. 628, 631 (1961).

26. Int.Rev.Code § 167(e) (1954).

Commission to regulate the availability of this benefit for working capital in each case by adjustment of the rate of return.

Legislative silence is a Delphic divination. The petitioner argues that ever since the 1954 Revenue Code was adopted Congress has been well aware of the FPC's policy of allowing normalization and that its inaction indicates approval of that policy.[27] By the same token, the Commission argues that Congress has been well aware of the lack of uniformity that has evolved among federal agencies as to the disposition of increased depreciation allowances under the revenue laws; that congressional inaction indicates approval of a discretionary authority in the regulatory agencies. The Civil Aeronautics Board and the Securities and Exchange Commission still permit normalization. On the other hand, the Interstate Commerce Commission has ordered flow-through to *income* since 1959.

Accounting for Federal Incomes Taxes, Interstate Commerce Commission Notice, February 9, 1959, Fed.Carr.Rep. ¶ 23,086. The Interstate Commerce Commission even requires flow-through of accelerated depreciation for the same carriers granted the benefit of the entire 7 per cent investment credit in the Revenue Act of 1964.

In the Revenue Acts of 1962 and 1964 Congress demonstrated that when it desires a tax statute to restrict the rate-making authority of federal regulatory agencies it does so in precise language. In the text of the 1964 Revenue Act Congress expressly provided that federal regulatory agencies shall not use the taxpayer's investment credit under Section 38 of the Internal Revenue Code for a given year to reduce the federal income tax component of cost of service, as had been proposed by the Federal Power Commission.[28]

**27.** In 1957, H.R. 5824 and S. 2113 were introduced in Congress. These bills provided that the Commission could not include tax deferrals arising as a result of Sections 167 and 168 of the Internal Revenue Code of 1954 in the determination of the rates of electric public utilities subject to the Federal Power Act. Both bills failed to pass. On September 2, 1958 Congress amended Section 167. No change was made in that Section to indicate that the Commission had misinterpreted the intent of Congress in its treatment of liberalized depreciation in carrying out its functions under the Natural Gas Act. The question of regulatory treatment of Sections 167 and 168 of the Revenue Code were the subject of an investigation and hearings in Congress. See "Rapid Amortization in Regulated Industries, Report of the Committee on the Judiciary, United States Senate, Subcommittee on Antitrust and Monopoly," Report No. 1380, 88th Congress, 2d Sess., March 12, 1958. At this time the Commission permitted normalization under Sections 167 and 168.

**28.** For the purpose of the investment credit, public utility property is taken into account as a "qualified investment" at 3/7 of the amount otherwise allowable. Int.Rev.Code § 46(c) (3) (A), added by Section 2(b) of the Revenue Act of 1962. See Treas.Reg. § 1.46–3 (g) (1) (1964). Section 46 provides that the amount of credit for all other tax-

payers will be seven per cent of the investment. Other taxpayers include other regulated companies—such as *natural gas pipelines*, railroads, airlines, truck and bus operators, and other types of public carriers. H.R. Rep. No. 749, 88th Cong., 2d Sess. (1963), 1964–1 (II) Cum. Bull. 162. Congress provided the 3 per cent credit for public utility property rather than 7 per cent since it was recognized that in this case part of the investment credit expected any larger credit probably would be passed on to the customers in lower rates. *Id.*, 1964–1 (II Cum.Bull. 163.

Different treatment of the investment credit and rapid depreciation seems justified by the nature of the two types of tax benefits. The Senate Report on the Revenue Act of 1962 distinguishes liberalized depreciation from the investment credit:

"Realistic depreciation alone * * * is not enough to provide the essential economic growth. In addition, a *specific incentive* must be provided if a higher rate of growth is to be achieved." S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962) U.S. Code Congressional and Administrative News, p. 3314. (Emphasis added).

The Committee added that the credit was preferable to the alternative of higher depreciation charges because, "the latter tend to distort income accounting and produce higher costs for book purposes". *Id.* at 12.

The Conference Report on the 1962 Revenue Act states that the investment credit purpose "in the case of *both* regulated and non-regulated industries, is to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment, thereby increasing the earnings of the new facilities over their productive lives." H.R.Rep.No.2508, 87th Cong., 2d Sess. 14 (1962) U.S.Code Congressional and Administrative News, p. 3734 (Emphasis added). Despite this reference by the conferees to regulated industries, the Federal Communications Commission and the Federal Power Commission indicated that the Section 38 benefits should flow through immediately to customers. Congress considered this view to be "clearly contrary to the intent of Congress" and, as a result, included in the 1964 Revenue Act a provision "reasserting its position that it was not * * * its intention that the Federal regulatory agencies require the benefit of the investment credit to 'flow through' in this manner." H.R. Rep.No.749, 88th Cong., 1st Sess. 37 (1963); Revenue Act of 1964 § 203(e). In expressly preserving the investment credit benefit for regulated industries, Congress again noted that the objective of the credit "is *to reduce the net cost* of acquiring new equipment," thereby increasing the earnings of the new facilities over their productive lives. Id. at 12. The credit is not a deduction from income as is depreciation under Section 167; it is a direct deduction from the tax payable. Congress has shown an inclination to set different rates of investment credit for different industries—the equivalent of 3 per cent for public utilities and 7 per cent for others. The investment credit is a precisely computed benefit specifically awarded to reduce net costs, and is therefore distinguishable from the traditional deduction for reasonable depreciation.

The petitioner underscores the fact that the Commission itself alerted Congress to the problem. Thus the Commission transmitted the *Amere* decision to Congress and pointedly noted its regulatory interpretation and practice in its annual reports to Congress; [29] Congress still refused to enact legislation precluding the FPC from authorizing normalization under Section 167.[30] The Commission, on the other hand, points to Amendment No. 350 of the Revenue Act of 1964 (H.R. 8363, 88th Cong., 1st Sess., December 9, 1963). This bill expressly provided that federal regulatory agencies, for rate purposes, normalize federal income taxes with respect to Section 167 liberalized depreciation deductions and permit a full return on the capital thus generated. Although federal agencies were following opposite and irreconcilable courses in their treatment of liberalized depreciation and although failure to enact the amendment would result in different treatment for investment credit, Congress declined to enact the amendment.[31]

---

29. FPC Ann.Rep. 75 (1956); FPC Ann. Rep. 75 (1957). See also S.Rep. No. 1380, 85th Cong. 2d Sess. 3–6 (1958).

30. See H.R. 5824, 85th Cong. 1st Sess. (1957); S. 2113, 85th Cong. 1st Sess. (1957). Section 168 was amended. Int. Rev.Code of 1954, §§ 168(e) (1), (e) (2), (e) (3), (e) (4), (e) (5), (i), and (j). A Senate subcommittee report commented on the FPCs treatment of Section 168 as "a surprising disclosure" and took the position that rapid depreciation under Section 168 was inappropriate for public utilities because they were guaranteed a return. S.Rep. 1380, 85th Cong. 2d Sess. 3–6 (1958). Senator Byrd, Chairman of the Senate Finance Committee, in a hearing on Section 168, said: There "is no justification whatever for a power utility to get a rapid tax depreciation. They are guaranteed profits. * * *" Hearings on S. 1795 Before the Senate Comm. on Finance, 85th Cong., 1st Sess. 9 (1957).

31. The bill was considered and rejected by the Senate Finance Committee and did not come to a vote on the floor. Press Release No. 20, Senate Finance Committee, Jan. 21, 1964. Flow-through of the investment credit itself did not pass without dissent. See S.Rep. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 (II)

 Of course, as far as possible the FPC should give effect to the Natural Gas Act and to Section 167.[32] To the extent it is impossible to accommodate both statutes, customary canons of statutory interpretation give controlling effect to the specific statute over the general statute.[33] Such canons are of no help in this case. The Commission contends that Natural Gas Act deals specifically with the regulation of rates in the natural gas industry; the Revenue Code of 1954 deals generally with the taxation of all industries. The petitioner contends that the specific provision in Section 167 for liberalized depreciation as a means of providing an incentive to plant expansion should prevail over general ratemaking authority.

Occam's razor slices through the arguments based on legislative history and congressional intent. Either Congress did not consider the concrete problem this case presents or, if it did, Congress decided to let sleeping dogs lie. In these circumstances, we turn to Judge Learned Hand's resolute advice. "Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occa-

sion." United States v. Klinger, 2 Cir., 1952, 199 F.2d 645.

 Given the long reach of the Natural Gas Act, as liberally interpreted by the Supreme Court, and weighing the consumer-oriented objectives of that Act against the Section 167 objective of promoting plant expansion by postponing the timing of tax payments, we conclude: It is unlikely to suppose that Congress amended the Natural Gas Act by a reference in the Internal Revenue Code; it is unreasonable to read Section 167 as a mandate reducing the Commission's responsibility to fix fair rates according to its usual ratemaking policies in favor of the consumer. At bottom, the question before us was and is one for Congress to decide. Assuming that Congress considered the effect of Section 167 on ratemaking at the time of enactment or later, we infer that its decision not to disturb, in terms, the status quo of ratemaking indicates a congressional intent that each federal regulatory agency should continue to exercise an informed discretionary authority in accordance with the agency's usual standards in the light of the needs peculiar to the particular industry subject to rate regulation.[34]

Cum.Bull. 672, 694–96 (individual views of Sen. Ribicoff; minority views of Sen. Gore).

32. The Commission's decision in *Panhandle Eastern* to allow a return of 1.5 per cent on the deferred reserves was an effort to accommodate Section 167 to the Natural Gas Act.

33. In Panama Canal Company v. Anderson, 5 Cir. 1963, 312 F.2d 98, 100, cert. denied, 375 U.S. 832, 84 S.Ct. 43, 11 L. Ed.2d 63, this Court said: " * * * If there is any repugnancy between them the specific or particular statute will control over and supersede a general statute even though the general measure be more recently enacted. Sutherland, Statutory Construction 3rd Ed. 541, § 5204, 82 C.J.S. Statutes § 369, p. 839; Bulova Watch Company v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L. Ed.2d 72; Enzor v. United States, 5 Cir. 1959, 262 F.2d 172, cert. den. 359 U.S. 953, 79 S.Ct. 740, 3 L.Ed.2d 761; Price

v. United States, 5 Cir. 1934, 74 F.2d 120, cert. den. 294 U.S. 720, 55 S.Ct. 549, 79 L.Ed. 1252, reh. den. 295 U.S. 767, 55 S.Ct. 643, 79 L.Ed. 1708."

34. When the California Public Utilities Commission sought review of this court's decision in *El Paso* in the Supreme Court, the Solicitor General of the United States, correctly we think, opposed the granting of certiorari on the ground that the case presented only a matter of administrative discretion:
" * * * From this survey, it appears that, whatever merit there may be in either method, the least that can be said is that a regulatory commission's choice between the two [normalization or flow-through] is assuredly within its discretion, depending on the particular views of the particular agency. No *general issue of law is involved*, only a discretionary choice among competing accounting systems. Such a choice is not one which war-

D. *Tax Savings from Normalization.* For any given tax year, a utility's depreciable properties include assets of various ages. Consequently, so the Commission found "below normal" depreciation on older assets is counter-balanced by "above normal" depreciation on new assets as long as the company continues the use of liberalized depreciation and continues to make at least some capital additions. Under these conditions, liberalized tax depreciation will always exceed straight-line tax depreciation and the accumulations established under the normalized rate and deferred tax accounting will continue to increase until the dollar value of gross plant stabilizes. Even if the composite plant of a company remains stable, where the dollar value of retirements equals the cost of replacements, annual liberalized depreciation will not be lower than straight-line depreciation and the reserve established under normalization will not decline.[35]

A regulated utility, therefore, will *never* be required to pay higher income taxes because of its election to claim liberalized depreciation *unless* its gross plant declines in dollar value as a result of lower demand or lower plant construction cost. Normalization during a period of growth or stability would force the ratepayers to provide funds for a hypothetical tax liability that might never become payable or, at the very least, to provide funds many years in advance of the time they are needed. The Commission's records show that the deferred tax accounts of Alabama-Tennessee and other pipeline companies have increased substantially since the accelerated depreciation election became available.

 Petitioner argues that under Section 167, liberalized depreciation is applied to facilities constructed during the period covered by the tax return and it is necessary that the taxpayer maintain the identity of individual units of property in order to know what deductions may be made each year for depreciation. Moreover, the Commission's Uniform System of Accounts requires this. That the reserve for deferred taxes may continue to increase for an indefinite period the petitioner deems of no consequence. The petitioner would hold the Commission in its ratemaking process to the same computation of depreciation on specific assets as required by the Internal Revenue Service under Section 167 for tax accounting. It would have the Commission disregard the cumulative reserve for accelerated depreciation for the utility's total assets. The Commission's error, according to petitioner, is that it refuses to recognize the mechanics of determining the taxes to be paid. The short answer is that accounting for tax purposes and even the Commission's present Uniform System of Accounts may be valuable tools, but they cannot dictate ratemaking policies. Cf. American Tel. & Tel. Co. v. United States, 1936, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142.

To support its ruling that the level of future expenditures for Alabama-Tennessee's operating plant will continue to increase or at least remain stable in the foreseeable future, the Commission re-

---

rants review by this Court. *Under the same principle, the choice is one which can be changed by the Commission should it become convinced that the other method is preferable.* Such a change can be made without disturbing the requirement that reserves already accumulated be used only for the originally intended consumers' benefit." (Brief for the Federal Power Commission in Opposition, State of California v. FPC, *supra,* pp. 11–12 (1961); emphasis supplied).

35. The Commission cites the National Association of Railroad and Utilities Commissioners, Report of 67th Annual Convention (1955); Eisner, Depreciation Under the New Tax Law, 33 Harv.Bus. Rev. 66–74 (1955); Davidson, Accelerated Depreciation and the Allocation of Income Taxes, 33 Accounting Rev. 173 (1958); and two arithmetic charts presented by the Secretary of the Treasury to the Senate Finance Committee in connection with the Revenue Act of 1962 (Hearings on H.R. 10650, 87th Cong., 2d Sess., Part 1, p. 384).

lied on records of the past and estimates of future growth of Alabama-Tennessee and of the natural gas pipeline industry. Alabama-Tennessee's annual reports on file with the Commission show an increase in sales from 9,504,752 Mcf in 1954 to 20,807,306 Mcf in 1962; an increase in net plant from $4,069,260 to $6,119,349.[36] Its investment in plant facilities shows corresponding growth. The intervenor's expert witness, Van Scoyoc, testified that natural gas pipelines may expect to continue their growth indefinitely.[37] From 1954 to 1960, nat-

36.

Gas Utility Plant [1]
Alabama-Tennessee Natural
Gas Company

| Year | Gross | Reserve for Depreciation | Net Plant |
|---|---|---|---|
| 1949 | $1,898,997 | $ 2,353 | $1,896,643 |
| 1950 | 3,315,222 | 77,792 | 3,237,429 |
| 1951 | 3,902,816 | 189,409 | 3,713,406 |
| 1952 | 4,059,345 | 318,936 | 3,740,408 |
| 1953 | 4,336,119 | 460,426 | 3,875,692 |
| 1954 | 4,655,459 | 586,198 | 4,069.260 |
| 1955 | 5,329,314 | 667,222 | 4,662,091 |
| 1956 | 5,423,710 | 815,325 | 4,608,384 |
| 1957 | 5,822,075 | 994,438 | 4,827,636 |
| 1958 | 6,226,161 | 1,186,563 | 5,039,597 |
| 1959 | 6,591,323 | 1,376,576 | 5,214,746 |
| 1960 | 7,151,489 | 1,590,767 | 5,560,722 |
| 1961 | 7,439,954 | 1,773,348 | 5,666,606 |
| 1962 | 8,031,865 | 1,912,515 | 6,119,349 |
| 1963 | 9,017,273 | 2,144,175 | 6,873,099 |

[1] Figures are taken from the Federal Power Commission's annual publication, Statistics of Natural Gas Companies.

37.

Gas Utility Plant [1]
Natural Gas Pipeline Companies
In Thousands

| Year | Gross Plant | Reserve for Depreciation | Net Plant |
|---|---|---|---|
| 1954 | $ 5,220,166 | $1,003,082 | $4,217,084 |
| 1955 | 5,692,265 | 1,161,629 | 4,530,636 |
| 1956 | 6,303,435 | 3,284,953 | 5,018,482 |
| 1957 | 7,359,854 | 1,491,217 | 5,868,637 |
| 1958 | 8,034,344 | 1,688,157 | 6,346,187 |
| 1959 | 8,973,860 | 1,973,078 | 7,000,782 |
| 1960 | 9,958,047 | 2,259,407 | 7,678,640 |
| 1961 [2] | 10,196,307 | 2,528,045 | 7,668,262 |
| 1962 | 10,963,623 | 2,839,385 | 8,124,238 |
| 1963 | 11,336,764 | 3,105,929 | 8,230,835 |

[1] Figures are taken from the Federal Power Commission's annual publication, Statistics of Natural Gas Companies.

[2] In 1961 there was a reclassification of companies formerly reported as "natural gas pipeline companies." In addition other adjustments were made to the Commission plant accounts. Thus the figures prior to 1961 are not comparable to those for 1961, 1962, and 1963. The figures for the latter three years show however, that pipeline companies have continued to expand their facilities.

ural gas pipelines increased their gross plant by an average of 11.07 per cent. During this same period, electric utilities increased their gross plant at the smaller annual rate of 8.38 per cent. Furthermore, the Commission found that, at least until 1980, nearly all responsible forecasts indicate a continued expansion of the gas pipeline industry.[38]

Alabama-Tennessee and amici supporting the petitioner argue persuasively that the Commission fails to give adequate consideration to future risks.[39] In the depression the public utility industry was the victim of misguided theories of depreciation and retirement reserve accounting. The petitioner insists that it cannot be assumed that the cash requirements in the future to pay deferred tax expenses will be offset by other items of tax deduction from other properties. The basic reality is that taxes deferred must be paid in the future; the permanence of deferrals or the equation of deferrals with savings is an illusion; deferred accounting is a necessity in order to meet future increases in taxes. Flow-through, so petitioner asserts, must necessarily have an adverse effect upon the

38. The forecasts of continued expansion relied upon by the Commission include: Report of the National Fuels and Energy Study Group to the Committee on Interior and Insular Affairs, 87th Cong., 2d Sess. (1962); Bureau of Statistics, American Gas Association, Projected Gas Utility and Pipeline Industry Statistics, 1963-1972 (1963).

The Report of the National Fuels and Energy Study Group, upon which the Commission placed reliance, concluded with respect to future gas consumption (p. 37):

A range between 20 trillion cubic feet and 23 trillion cubic feet to be used in 1980 seems to satisfy the expectations of most of the estimators as determined by the margin-of-error concept. This would represent an increase of between seven-tenths and nine-tenths over consumption in 1960. * * *

For the purpose of this study it is concluded, then, that the use of gas in 1980 will be somewhat less than double the 1960 usage—that the use of gas will increase somewhat more slowly than will the use of coal or total energy.

The forecast by the Bureau of Statistics of the American Gas Association estimated that gross plant for the gas utility and pipeline industry will increase from 24.7 billion dollars in 1962 to 42.5 billion dollars in 1972. These forecasts were based on estimates submitted by individual gas companies.

39. In a notable opinion, Judge Schaefer, for the Illinois Supreme Court, said: "The assumption of a continuous deferral of taxes due to accelerated depreciation may be justified in many cases and the Commission would be justified in acting on this assumption if it saw fit. [citations omitted] Experience may show that proper results can only be achieved

by this approach. However, several not unlikely events might occur which would prove the assumption erroneous. A war, a general depression or a decline in the local market might curtail a utility's capital expenditures, and prevent further tax deferrals. As a result, taxes might increase just at the time when economic circumstances would make the added expense most burdensome. It is also possible that section 167 will be repealed, thus ending further tax deferrals.

If we could see clearly into the future and say with certainty that continuing expansion was certain, and countervailing considerations were nonexistent, we would hold that the Commission may not permit current charges for a liability that will never arise. Predictions of future developments, however, are unsure estimates at best. The problem is a new one; that factual and policy considerations that bear upon its solution have not as yet been fully developed. Even the future of accelerated depreciation in the Federal tax structure is not entirely settled. If for any reason continued investment in utility plant at current levels should cease, or accelerated depreciation be denied, the financial stability of utilities might be jeopardized if some provision had not been made for the increased taxes that would result. Rate regulation is a continuing process; greater experience may bring greater wisdom in dealing with these problems. At this time, we think it permissible for the Commission to safeguard the financial integrity of utilities by recognizing as present expenses those tax liabilities which are deferred by use of accelerated depreciation for Federal tax purposes." City of Alton v. Commerce Commission, 1960, 19 Ill.2d 76, 165 N.E.2d 513, 521-522.

financial standing and credit. And an overhanging burden of unfunded deferred taxes imposes additional risks which will be reflected in the cost of equity and debt-financing.

It is true that the Commission's decision rests on its reading of the future. But clairvoyance is part of the daily grind of a regulatory agency. Whether flow-through or normalization is the rule, the agency must base the rule on some projection into the future. As we see it, the case for normalization requires more speculation than the case for flow-through. And it is at the expense of consumers.

■ On the record before us and the facts outside of the record which the Commission properly notices, the Commission's ruling is based on substantial evidence of present conditions and a fair guess as to future conditions in the pipeline industry. If the Commission is wrong, the pipelines will still have paid only actual taxes; these will be recouped in full as part of the cost of service. Besides, as a hedge against the risk of a "payback", the Commission has allowed Alabama-Tennessee to retain tax reserves accumulated since 1954.[40] Should the future support the Commission's competency in clairvoyance and should normalization be allowed, consumers will have made enormous contributions to the pipelines' capital funds at no cost to the pipelines. The Commission must, of course, concern itself with the possibility of having misread the future and with the future's taking a turn without bene-

fit of advice from the Commission. All things change. But we should expect agency policy to be sufficiently flexible to attempt to change with changing times. Sufficient unto the day is the evil thereof.

■ In final analysis, putting to one side the issue of congressional intent, the petitioner's challenge to the FPC order addresses itself to the competency of the Commission to choose between competing accounting theories and competing economic guesses. We see nothing irrational in the Commission's choice.

E. *Miscellaneous Attack on Order.* Petitioner attacks the Commission's finding that flow-through will stimulate investment. The Commission believes that lower rates will tend to generate a higher volume of sales and thus ultimately require expansion of gas transmission facilities. The Commission found that in the past two decades pipelines have financed a tremendous expansion, at a cost of over $9 billion, and there is no indication that they will have any problem financing the more moderate expansion expected in the near future. As for Alabama-Tennessee the Commission found that the petitioner has achieved a "favorable position in the eye of the investor" and an "ability to finance successfully." [41]

The amicus brief of Arthur Andersen & Co. attempts to show that if normalization is followed and no return is allowed that consumers would pay one tenth of one per cent *lower* rates than if flow-through is required. This con-

40. In a similar situation the Illinois Supreme Court set aside an order of the Commerce Commission allowing a water company an operating deduction for deferred taxes without making an offsetting deduction in the determination of the rate base. The court accepted the principle of normalization both for accounting and for ratemaking but required the excess in tax allowances over actual taxes to be credited to a special reserve, the amount of this reserve being deducted from cost-new in arriving at the rate base. City of Alton v. Commerce Commission, supra note 39. Judge Schaefer, for the court, said: "Funds generated

by accruing deferred tax expenses, and any facilities financed out of those funds, must be excluded from the rate base. The earning power of this money then will either decrease consumer rates or increase service. The economic benefit to consumers over the life of any given asset should be about the same as if no accrual of deferred tax expenses were allowed, but it will be spread evenly over the useful life of the asset rather than being concentrated in the early years when depreciation rates for tax purposes are above normal." 165 N.E.2d at 522.

41. See footnote 36.

tention, however, makes no allowance to consumers for loss of interest on the accumulated tax reserves. If interest costs on the accumulated tax reserves are included, the consumers bear a greater cost over the years under normalization than flow-through. In addition, exercising its special competency, the Commission determined that Andersen's assumptions of plant life and other matters were unrealistic and unrelated to Alabama-Tennessee or to the industry.

Alabama-Tennessee states that to minimize the risk of future contingent liability for taxes it will be forced to give up the use of liberalized depreciation. May 5, 1964, Alabama-Tennessee advised the Commission of this intention. The Commission indicated its approval of petitioner's accounting entries to reflect the election to use straight-line depreciation after January 1, 1963, but stated that this approval "should not, however, be deemed as any prejudgment of the rate treatment to be given such action." [42] Later the Commission informed Alabama-Tennessee that this issue "could be litigated only in a new Section 4 proceeding to be instituted by petitioner if it desires to convert to straight-line depreciation taxes and such conversion results in a net increase of cost of service over that in 1960, the base period in this case." [43] Since the Commission has not yet ruled on petitioner's application

for conversion to straight-line tax depreciation, the effect of the proposed conversion is not a proper subject for review in this case.[44]

The petitioner asserts that the Commission erred in denying any return upon tax deferrals already accrued, by including them at zero cost in computing Alabama-Tennessee's overall rate of return.[45] The Commission's view is that Alabama-Tennessee and other pipeline companies should be given the option of retaining the accumulations as reserves or of amortizing them over a period of years by refunds or rate reductions under a submitted plan. This view is consistent with the Commission's finding that no cost has been incurred in the accumulation of these balances.

■■ The petitioner sets forth the same arguments against denial of return on the accrued funds as against denial of normalization. We find that the Commission's decision not to allow a return on accumulated deferred tax balances is supported by essentially the same evidence as its decision to adopt flow-through. It is improbable, so the Commission found, that these accumulated tax balances will be needed for future tax liability. They have become consumer-contributed capital without specific purpose. The consumer already suffers the loss of interest on these funds. This being the case, it would be further anomaly for the

---

42. FPC's answer to petitioner's motion for stay for this appeal.

43. FPC's answer to motion for stay of order.

44. The Commission was careful to say that the decision was not to be taken as indicating any views on the question whether a company that does not elect to compute its taxes on the liberalized depreciation method should have its rates fixed as though it did. The Commission observed that the decision involved no reexamination of policy with respect to accelerated amortization under Section 168 of the Internal Revenue Code. 31 F.P.C. at 210.

The Commission has instituted a proceeding under Section 5 of the Natural Gas Act "for the purpose of implementing the regulatory policies determined

and established" in the opinions under review here. FPC Docket No. R–264, July 7, 1964, 29 Fed.Reg. 9723.

45. The Commission had inadvertently included the reserves at zero cost in Opinion No. 360, which was intended to dispose only of all other issues in the cases involved in this proceeding. This error was recognized in Opinion No. 417–A, but the Commission ratified the error on the basis of its adoption of the flow-through principle. The Commission asserts that including the tax reserves at zero cost reaches the same result as deducting the reserves from Alabama-Tennessee's rate base. Although petitioner rejects the basic principle of zero return on the past tax accruals, it does not protest the Commission's method for excluding the reserves from the rate base.

consumer to pay the pipelines a return on the capital. Rate of return on capital, like the flow-through question, must be left within the sound discretion of the Commission.

■ We have considered all of the contentions of the petitioner and the amici and have carefully considered certain contentions not discussed in depth in this opinion. We find substantial evidence and fair inferences supporting the Commission's finding that there is no justification, on the facts here presented, for including in the petitioner's cost of service an allowance for taxes in excess of the petitioner's actual tax liability.

## II.

■ We must say, as an initial reaction, that it strikes us as singularly eccentric that a matter as important to the natural gas industry as the Commission's about-face on liberalized depreciation should be resolved in an Alabama-Tennessee rate increase proceeding. Or that the only pertinent testimony came from one witness. And that this lone witness was the intervenor's, not the Commission's witness.[46] Nevertheless, taken separately or cumulatively, these eccentricities do not rise to the level of fatal procedural defects. The Commission has such an immense task to perform that what might seem an eccentricity to the court may instead be a pragmatic administrative adjustment to the immensity of the Commission's task.

A. Alabama-Tennessee contends that the question of liberalized depreciation was not properly in issue. Neither the

Commission's staff nor the petitioner expressly raised it and neither presented evidence with respect to it at the original hearing. However, the intervenor, Tennessee Valley Municipal Gas Association, whose members account for over 80 per cent of Alabama-Tennessee's natural gas sales subject to FPC jurisdiction, raised the point and produced an expert to testify on the issue.[47] Neither the Commission nor Alabama-Tennessee objected to the intervention.

■ The liberalized depreciation issue may be considered as much a part of the rate hearings as any other element of expense. As the petitioner itself observes, since 1954 that question has been raised continually in rate proceedings.[48] We conclude that the issue was properly raised in this case, and that the petitioner received enough notice of its significance to have protected itself by rebuttal evidence before the end of the hearing.

■ At the time of the hearing it was reasonable for the petitioner to rely on the Commission's then well-established policy of allowing normalization. It was not unreasonable for the petitioner to assume that the Commission's failure to offer witnesses on flow-through normalization indicated that the Commission had no intention of reversing itself. But when the Commission issued its order severing depreciation from other issues that action should have put the petitioner on guard and provoked prompt defensive measures. Instead, the petitioner made no effort to introduce rebuttal evidence by reopening the record as provided in

46. This witness, Melwood Van Scoyoc, testified in *Amere* on behalf of several cities opposing the requested ruling and made the same contentions the Commission relies upon here. 15 F.P.C. at 769.

47. The Commission's rules on intervention are liberal. Once the petition to intervene has been filed, the Commission and other parties may file an answer and in default thereof, may be deemed to have waived any objection to the granting of the petition. FPC Rules of Practice

and Procedure §§ 1.8(c), (d), and (e), 18 C.F.R. §§ 1.8(c), (d), and (e).

48. Even though the Commission had clearly stated its policy in Amere Gas Utilities Company, 15 F.P.C. 760 (1956), the liberalized depreciation issue was repeatedly raised and disposed of in later cases, including El Paso Natural Gas Co., 22 F.P.C. 260, (1959); United Fuel Gas Co., 23 F.P.C. 127, (1960); Phillips Petroleum Co., 24 F.P.C. 537, (1960).

the Commission's Rules of Procedure [49] and in the Administrative Procedure Act.[50] Alabama-Tennessee filed only an application for "rehearing" (reconsideration) of the Commission's order for oral argument on the liberalized depreciation issue. This motion protested the reopening of the cases on the ground, among others, that petitioner had given no evidence in the hearing on the liberalized depreciation issue. Following denial of this motion, Alabama-Tennessee still failed to file a petition for introduction of additional evidence. Even after the Commission adopted the flow-through principle, petitioner did not seek leave of court to adduce additional material evidence under Section 19(b) of the Natural Gas Act.[51] We conclude that the initial prejudice from lack of notice evaporated; that the petitioner was not deprived of statutory rights or constitutional due process.

B. The petitioner charges the Commission with an abuse of discretion in severing the liberalized depreciation issue and in deciding it in a ratemaking proceeding under Section 4 of the Natural Gas Act rather than a rate investigation under Section 5(a) of the Act. The difference is significant, petitioner argues, because the burden of proof shifts to the Commission in a rate investigation. In addition, the petitioner asserts, the effect of the approach the FPC used was to deprive other interested parties in the natural gas industry who would have made extensive evidentiary presentations in the original proceedings. The petitioner takes the position that Opinion No. 360 disposing of all the other issues in the case in effect terminated the ratemaking proceeding, and later oral argument on the liberalized depreciation issue was the equivalent of a new rate investigation by the Commission.

According to the Commission, severance of the flow-through/normalization issue expedited disposition of Alabama-Tennessee rate increase cases. This explanation is somewhat less than obvious: the hearing commenced July 13, 1960; the examiner gave his decision September 25, 1961; the Commission issued its severance order June 1, 1962; Opinion No. 360 came down June 13, 1962; the oral argument was held May 16, 1963; the Commission did not issue Opinion 417 until February 3, 1964 and its final order (Opinion 417-A) until April 15, 1964. Since the Commission's recantation affects only the fourth case, it can be said that the three earlier cases were expedited.

■ We have already decided that liberalized depreciation was properly in issue in the ratemaking proceedings. Accordingly, we find that the Commission's action in reserving decision and ordering additional argument on the liberalized depreciation issue was not an abuse of its discretion. See Federal Power Commission v. Tennessee Gas Transmission Company, 1962, 371 U.S. 145, 154–155, 83 S.Ct. 211, 9 L.Ed.2d 199, 206, holding that the issuance of an interim order making a partial reduction in a proposed increased rate on the basis of decision of one issue, and deferring decision on the remaining questions was "an appropriate exercise of the power granted the Commission by the Act".

49. Sections 1.33(a) and (c) of the Commission's Rules of Practice and Procedure (18 C.F.R. §§ 1.33(a) and (c)) provide that a "petition to reopen the proceeding for the purpose of taking additional evidence" may be filed when an Examiner's "initial decision has been issued * * * but no Commission decision has yet been issued."

50. See Section 7(c), 5 U.S.C. § 1006(c).

51. 15 U.S.C. § 717r(b): "* * * If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. * * *" See Sun Oil Company v. Federal Power Commission, 5 Cir. 1958, 255 F.2d 557.

The Commission was not obligated to decide the rapid depreciation issue in a rulemaking rather than a ratemaking proceeding. The choice between proceeding by general rule or by individual, ad hoc litigation is one that lies in the informed discretion of the administrative agency.[52] Securities and Exchange Commission v. Chenery, 1947, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995, 2002. The borderline between rulemaking and adjudications is not precise. Rules are typically designed to apply to unnamed parties, but may sometimes be directed to a problem of a named individual or a small group; adjudications are typically designed to apply to named parties, but may involve hundreds or thousands of parties. Opinions that accompany adjudications may have essentially the same effect as rules. 1 Davis, Administrative Law § 5.01 (1958). In this case the Commission felt that the time had come to reexamine the ratemaking treatment of liberalized depreciation. In applying its new policy to Alabama-Tennessee, the Commission could not overlook the wide application the change in policy would have on the natural gas industry. It was for the Commission to decide how to allow interested parties to present their views.[53] It was clearly within the ambit of reasonable discretion to allow participation by amici in oral argument and by the filing of briefs.

We do not say that the Commission chose the best procedure for changing a longstanding policy. As long, however, as the Commission stays within constitutional and statutory limits, it is competent to determine whether to deal with a policy problem in an adjudicatory proceeding, a rulemaking proceeding, or a special proceeding of the type employed in this case. Securities and Exchange Commission v. Chenery Corp., supra, 332 U.S. at 203, 67 S.Ct. at 1580, 91 L.Ed. at 2003. The order under review here leaves any pipeline company not a party to this proceeding free to introduce evidence demonstrating the inapplicability of the Alabama-Tennessee ruling to its individ-

---

52. "It should therefore be emphasized, as the FTC recognized in the trade regulation rule proceeding, that the choice between rulemaking and adjudication is not necessarily the choice between the articulation of a rule and an *ad hoc* approach in which each case is governed only by a general statutory provision. Agencies, like courts, frequently evolve detailed and precise rules in the course of adjudication. Indeed, it is worth noting that in Judge Friendly's lectures on the need for better definition of standards, his examples of successful formulation are taken from instances of adjudication. * * * The soundness and lawfulness of any given rule may be subject to challenge, but the existence of general authority to act in this manner can hardly be questioned, and it is evident that the effect of such a rule is to narrow and simplify the issues requiring resolution in subsequent cases." Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 926 (1965). See also Fuchs, Agency Development of Policy Through Rule-Making, 59 Nw.U.L. Rev. 781, 800 (1965).

53. "The device of the brief amicus curiae, which has become increasingly common in Supreme Court proceedings, has also been used by administrative agencies. * * * True, the use of such a device rests within the discretion if not the whim of the agency, but there is no reason why it cannot fulfill any perceived need for general reaction to a proposed policy. Especially since section 4 of the APA permits participation in rulemaking to be limited to written submissions and since an amicus may be allowed to make an oral presentation, the difference between the two approaches in terms of opportunity for comment does not seem substantial." Shapiro, *supra* note 52, at 931. Professor Shapiro noted that some questions may turn on the fact that an amicus is not a "party" to the administrative proceeding, citing Opinion No. 417–A in *Alabama-Tennessee. Ibid.* & n. 37. However, the only question in No. 417–A that turned on this distinction was whether the amici had a formal right to petition for rehearing of the original No. 417. The Commission held that the amici did not have this right, but it went on nonetheless to consider the amici's contentions made in their applications for rehearing "because of the importance and industry-wide implications" of the new § 167 policy determination. 31 F. P.C. 928, 929 (1964).

ual situation. See, e. g., Natural Gas Pipeline Co. of America, FPC Op. No. 456–A, Fed.Util.Law Rep. ¶ 10,626 (June 23, 1965). We conclude that the Commission was within its power in adopting flow-through for Alabama-Tennessee in a proceeding under Section 4 of the Natural Gas Act, even though the findings and order with respect to the petitioner establish a policy that may also affect other interstate pipeline companies.

Petition denied.